**UNITED STATES of America**

v.

**147.47 ACRES OF LAND IN MONROE COUNTY, PENNSYLVANIA, Austin Flotten, et al. (TRACT No. 561).**

Civ. No. 68–44.

United States District Court,
M. D. Pennsylvania.

Nov. 22, 1972.

S. John Cottone, U. S. Atty., Scranton, Pa., for plaintiff.

Gelb, Carey & Meyers, Scranton, Pa., for defendants.

### MEMORANDUM AND ORDER

NEALON, District Judge.

In this land condemnation case, a jury returned a verdict in favor of the landowner, Delagap Corporation, in the

amount of $100,000. The Government has filed a motion for a new trial contending (1) the testimony of Mr. Donato A. Lettini, President of Delagap, concerning market value should be accorded little, if any, weight and is not sufficient to sustain the verdict; (2) that the testimony of landowner's real estate experts as to market value was speculative in that an erroneous "lot method" appraisal was used for a subdivision that was a hypothetical rather than an active development; and (3) the Court erred in refusing the Government's points for charge on the "lot method" of appraisal. The fatual background follows.

On June 27, 1942, Donato A. Lettini, a general contractor in the construction field, purchased a large tract of land in the Borough of Delaware Water Gap, Monroe County, Pennsylvania, overlooking the Delaware Water Gap itself. On November 2, 1959, in response to a recommendation by his lawyer and accountant that title be transferred to a corporate entity, for tax purposes, Mr. Lettini conveyed 59.1 acres of this tract to Delagap Corporation[1] for a consideration of $59,100. Pennsylvania and federal transfer taxes of approximately $600 were paid on that amount. During the years 1958 and 1959, Michael A. Policelli, a registered engineer, surveyed the property and in 1960 a map of lots was prepared showing a subdivision of the acreage in question into lots with a lake, park area, and numerous roads plotted thereon. The property was considered as especially appealing for development purposes inasmuch as it was in the Pocono resort area, had a spectacular view of the Delaware Water Gap, was less than 100 miles from the metropolitan areas of New York and Philadelphia, was readily accessible to Interstate Route 80, and had a generous supply of water. Commencing in 1958, Mr. Lettini cut a road into the property and constructed, graded and placed a gravel topping on other roads throughout the property; cleared the trees and brush; excavated and created a 5½ acre spring-fed lake, 14 feet at its deepest point, and stocked it with fish; and dug a well 585 feet deep which was capable of producing 150 gallons a minute, enough to service 150 homes. Beginning on August 6, 1960, and ending June 27, 1966, Delagap sold 11 lots, as identified on the Policelli map, comprising a total of 2.48 acres, to certain relatives and friends for a total consideration of $12,460.[2] According to Mr. Lettini, he did this reluctantly and as a favor to the grantees inasmuch as his original plan was to actually construct the homes himself and to sell the homes as a part of his subdivision plan.[3] (One lot purchaser did construct a home prior to condemnation.) It should be pointed out here that Mr. Lettini had extensive experience in land development and building construction, having erected shopping centers, apartment houses, and residential subdivisions in Union, Caldwell, Elizabeth, and Cedar Grove, New Jersey. It is also conceded by the Government that Mr. Lettini's subdivision plans were not made in anticipation of any governmental condemnation project. The Government condemned the subject property on January 30, 1968.

In expressing his opinion of market value, Mr. Lettini contended the property had a value of $5,000 per acre, or $250,000 for the 50.7 acres condemned. Mr. Guyton Kempter, a Registered Professional Engineer in Monroe County, testified that the property was adaptable to subdivision and that the layout was a "good engineering plan for that property".

---

1. There are a total of 1,000 shares in Delagap Corporation of which Mr. Lettini owns 600, his son 398, his wife one, and his accountant one.

2. These deeds contained comprehensive restrictions concerning the type of building that could be erected and use of the premises generally.

3. It is only fair to assume that public knowledge of the impending Tocks Island condemnations dampened the prospects for development of the areas affected.

The landowner produced two real estate experts, Mr. Davis Chant and Mr. William Henkelman. Each testified in great detail as to the physical characteristics of the condemned property and concluded that its highest and best use was as a recreational-residential subdivision. Mr. Chant testified that he used comparable sales in determining market value and identified these as an analysis of lot sales in seven Pocono Mountan development tracts, as well as sale of 33 unimproved acres from W. B. Eilenberger to Fox Ridge Realty Co., and 36.25 acres from Pardee Place to William Copper. In his opinion, the fair market value of the land taken was $85,000. On cross examination, Mr. Chant stated that he considered the sales hereinabove referred to and, in addition, evaluated the land on a lot basis for a gross value of $393,000 for 131 lots from which he deducted the following estimated costs: $27,000 for roads, $3,100 engineering expenses, $66,810 sales commissions, $39,300 administrative costs, $5,000 interest costs, $500 taxes, $68,775 advertising and sales promotion, and $98,250 profit. These expenses added up to $308,735, and when deducted from $393,000, left a balance rounded out to $85,000. According to Mr. Chant, the land would be developed and sold out in one year which, from experience he had in two other Pocono area developments containing 900 lots and 400 lots, could be accomplished without difficulty.

Mr. Henkelman testified that he viewed and examined the subject property on nine different occasions. He stated that he discussed lot sales and prices received therefor with Pocono Mountain land developers at Locust Lakes, Lake Naomi, Hemlock Farms, Pine Ridge, and Hidden Lake, and considered these as comparable sales for lots. According to the witness, he also considered the lot value approach, concluding that the gross sale amount in a one-year sellout [4] would be $371,500 from which would be deduct-

ed $26,400 to complete the roads, $13,100 for engineering and surveying, $59,440 sales commissions, $37,150 administrative expenses, $55,725 advertising, $4,500 interest, $250 taxes, and $92,875 profit, leaving a balance of $82,000 which he considered to be the fair market value.

The Government's two experts regarded the highest and best use as being for seasonal residential development and recreational purposes and placed the market value at $33,000 and $21,500 respectively. The jury returned a verdict of $100,000, higher than the opinions of all four experts, but less than that of Mr. Lettini.

## I. *Mr. Lettini's Testimony*

The owner of land taken by a governmental agency is entitled to the fair market value of the property at the time of taking. Market value is what a willing buyer would pay in cash to a willing seller, United States v. Miller, 317 U.S. 369, 373–374, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Sales of comparable land in the area most accurately evidence fair market value. United States v. Featherston, 325 F.2d 539 (10th Cir. 1963). However, the law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation. Sill Corporation v. United States, 343 F.2d 411, 416 (10th Cir.) cert. denied, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965). The modern federal rule is that all relevant and material evidence is admissible unless there is a sound, practical reason for barring it. United States v. 60.14 Acres of Land, 362 F.2d 660, 666 (3d Cir. 1966). Accordingly, the opinion testimony of a landowner on the valuation of his land has been admitted in federal courts without further qualification. The basis for admitting such testimony is a presumption of special knowledge arising out of ownership. United States v. 3,698.63 Acres of Land,

---

4. Mr. Henkelman was also satisfied that the lots would be sold in a year pointing to other Pocono developments, such as Locust Lakes, where 323 lots were sold in one year and Lake Naomi, where 200 to 250 lots were sold in one year.

etc., North Dakota, 416 F.2d 65, 67 (8th Cir. 1969); United States v. Sowards, 370 F.2d 87 (10th Cir. 1966); United States v. 60.41 Acres of Land, *supra*; Kintner v. United States, 156 F.2d 5, 7 (3d Cir. 1946). In the case before the Court, Mr. Lettini, President of the corporate landowner, came armed with an additional credential in that he had wide experience as a building contractor and land developer and, consequently, had more qualifications than the average landowner. No objection was made to his testimony or to the reasons given in support thereof. The jury apparently was impressed by his testimony as the verdict rendered was higher than all expert testimony. Consequently, the verdict is supportable on his unchallenged testimony alone.

## II. *The Testimony of Plaintiff's Expert Witnesses*

■ The Government contends that the testimony of Messrs. Chant and Henkelman should not have been allowed because it was erroneously predicated on a highest and best use of a subdivided residential-recreational area and utilized an improper "lot method" appraisal.[5]

Initially, it should not be overlooked that both Chant and Henkelman testified on direct examination that they used comparable sales in coming to their determinations of market value. Chant specifically stated that he used lot values as market data *in addition to* comparable sales. (emphasis supplied) As in United States v. 3.544 Acres of Land, *supra*, the testimony as to lot value was developed at the insistence of the Government on cross examination and while the record shows that such lot value was considered by Chant and Henkelman, it does not appear that it was the sole or decisive or exclusive factor in the formation of their opinions as to market value. The jury, under the Court's instructions, could properly have concluded

that landowner's expert testimony was grounded on comparable sales.

However, assuming arguendo, that the testimony of Chant and Henkelman is based on a lot valuation approach, I am still unpersuaded by Government counsel's objections. The Government makes much of the fact that the landowner's map had not been recorded in the Monroe County Recorder of Deed's Office and that no approval of a plan of subdivision had been obtained from the County Planning Board. These failures are factors to be considered in determining whether there was a subdivision at the time of taking but they are by no means dispositive. At oral argument, Government counsel conceded that if a subdivision actually existed at the date of taking, then a lot valuation approach using the market value of each lot less expenses would be appropriate. He asserted, however, that a subdivision did not exist at the time of taking and any estimate of retail prices for lots and the expenses concomitant with subdividing would be highly speculative and prejudicial to the Government.

In considering this argument, we must return once again to the rule enunciated in Sill Corporation v. United States, *supra*, that the law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation. "Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules." United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). In United States v. 60.14 Acres of Land, *supra*, the Court referred to the often quoted words of Chief Judge Parker, " 'Artificial rules of evidence which exclude from the consideration of the jurors matters which men consider in their everyday affairs hinder rather than help them at arriving at a just re-

---

5. The phrase "lot method" appraisal was the characterization given to such type testimony by our Court of Appeals in

United States v. 3.544 Acres of Land, 147 F.2d 596 (3d Cir. 1945).

sult. In no branch of the law is it more important to remember this, than in cases involving the valuation of property, where "at best, evidence of value is largely a matter of opinion". *See* Montana R. Co. v. Warren, 137 U.S. 348, 352, 11 S.Ct. 96, 34 L.Ed. 681 * * * [1890].' United States v. 25.406 Acres of Land, 172 F.2d 990, 995 (4 Cir. 1949), cert. denied, 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738."

■ It may well be that even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a "lot method" appraisal or a "developer's residual" approach, as it is also known, would be inappropriate. But that is not the situation here. The status of the subdivision and its availability for sale within the reasonably foreseeable future was an actual and real one, certainly not hypothetical, remote or speculative. Someone about to purchase the property on January 30, 1968, the date of condemnation, would have to regard it as having a highest and best use as a subdivision and, in determining what purchase price he would be willing to pay, would have to consider all factors, including sales price for individual lots and additional expenses of development, in arriving at his decision. The Pennsylvania Supreme Court in Stoner v. Metropolitan Edison Co., 439 Pa. 333, 337, 339, 266 A.2d 718, 722 (1970), recognized that those uses which would occur to the average buyer and influence him must enter directly into the market value of the land regardless of the use to which the owner had previously applied the land and held in that case that "(t)he evidence presented was sufficient to persuade a jury that a buyer, at the time of condemnation, would have been influenced by this possibility of future development . . .". In United States v. Iriarte, 166 F.2d 800, 804 (1st Cir. 1948) the Court noted that ". . . the price a promoter would pay for undeveloped land suitable for subdivision would be influenced by the price he would expect to get per lot after subdivision . . . (b)ut, of course, he would also take into account the expense of development . . .". See also United States v. City of New York, 165 F.2d 526 (2d Cir. 1948). All facts which would influence a person of ordinary prudence, desiring to purchase the property, are admissible. Kimball Laundry Co. v. United States, 338 U.S. 1, 16, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). And, as hereinbefore noted, the modern trend favors a broad rule of admissibility, with discretion in the trial court. United States v. 60.14 Acres of Land, *supra*; United States v. 25.406 Acres of Land et al., 172 F.2d 990, 993 (4th Cir. 1949). This is not a case where a landowner dreamily contemplates the use to which his property may be put at some undefined future time but rather one where the property is geographically suited for development; is located in a booming developmental area; has been subdivided into lots according to a duly certified map; has been cleared and graded and improved with the creation of a spring-fed lake, the construction of access roads, and the digging of a deep well sufficient to supply water to 150 homes; and where actual sales of lots as identified on the map have taken place, the deeds of which contain building restrictions compatible only with a residential real estate development. In United States v. 100 Acres of Land in Marin County, 468 F.2d 1261 (9th Cir. 1972), the Court upheld the use of the "developer's residual approach" and described it as follows:

"In arriving at their values, the owner's witnesses took into consideration the market data of sales of adjacent subdivided lots and made deductions for selling and advertising expenses, engineering and development costs, overhead costs, taxes, buyers' anticipated profits, and for acreage lost for streets, etc. in order to reflect or indicate the value of the property at the time of taking. In this case, the data relied on was derived from the market

and facts as had been generated in the development of adjacent land. This method is referred to as the 'developer's residual approach'."

In Marin County, *supra*, it is true that there was a subdivision of adjacent land from which the market data and expenses were obtained but, unlike here, the condemned land itself had not been subdivided, although this was imminent, and only some preparatory physical work had been completed. In the case before us substantial physical work and actual sales of lots had taken place. Moreover, the landowner's experts had the opportunity to compare sales prices for lots and concomitant development costs in other Pocono Mountain land developments, some as close as three miles away and which were considered comparable, and therefore, had the benefit of much the same market data and expenses as were present in Marin

County, *supra*. Chant also testified that he was broker of record for several residential subdivision developers in the Pocono Mountain region, e. g., Gold Key Lake, Sunrise Lake, and Konashoa Lake, and assisted those developers in determining the pricing of their individual lots so that they could compete in the Pocono Market.

Therefore, I am satisfied that the "lot method" appraisal or "developer's residual approach" was justified under the circumstances of this case.

### III. *Exceptions to the Court's Charge*

The gist of the exceptions goes to the Court's instructions relating to the landowner's testimony [6] and the factors guiding the acceptance of opinions based on lot sales from a subdivision.[7] I have carefully reviewed the Government's exceptions to the refusal of certain points for charge and

6. "Now, the law permits an owner of a property taken in condemnation proceeding to testify as to the fair market value of the property at the time of taking, and the testimony of an owner as to fair market value is to be weighed and considered by you the same as that of any other witness expressing an opinion as to the fair market value at the time of taking. That is to say, if you should decide that the reasons given in support of the landowner's opinion as to the fair market value are sound, then you may accept it. If you conclude that the reasons given in support are not sound, you may reject that opinion or give it any weight that you might think it deserves.

"In determining the fair market value of the property taken, you may not consider the need of the Government for the property nor whether or not the defendant owner wanted to sell it. Your task is to find out what the fair market value of the tract involved in this trial was at the time of the taking uninfluenced in any way by either the necessity of the Government or the wishes or wants or desires or special interests that an owner may have in a particular property." N. T. 239

7. "Now, Members of the Jury, before you can accept opinions based on this market data approach, you must be satisfied that

there was a reasonable probability that this property could be developed as a residential subdivision and that the lots therein would be sold within a reasonable time. If the subdivision is improbable or unrealistic or merely theoretical or speculative or capable of realization only in the remote future, then you cannot consider this market data approach based on the sale of individual lots and any opinion based thereon must be rejected. However, if you conclude that this property by map was subdivided into individual lots; that the property was adaptable for residential subdivision purposes; that physical changes were made on the land, such as the digging of a well with a sufficient water supply for development purposes; constructing a lake; road grading and other physical changes in the condition of the land; that some lot sales had actually taken place; that there was a reasonable probability that this property could be developed as a residential subdivision; that the anticipated expenses of development would be as outlined by the landowner's witnesses; that there would be a market for the sale of these lots and that these lots would be sold within a reasonable time—in this case, as I said, landowner's witness said within a year—then you may accept the opinion based upon market data approach." N.T. 244, 245

find that the charge fairly and accurately summarized the applicable law. The Court is under no obligation to adopt the precise language requested by counsel so long as the charge is fair and adequate and contains the substance of the point requested. The motion for a new trial will be denied.