**CITY OF ST. PAUL, Petitioner,**
**Appellant,**

v.

**REIN RECREATION, INC., formerly**
**Watergate Marina, Inc., Respondent.**

No. 50266.

Supreme Court of Minnesota.

Aug. 22, 1980.

See also, 298 N.W.2d 51.

Edward P. Starr, City Atty., and Jerome J. Segal, Asst. City Atty., St. Paul, for appellant.

Larkin, Hoffman, Daly & Lindgren, James P. Larkin, Christopher J. Dietzen, Wendell R. Anderson, and James Miley, Minneapolis, for respondent.

OTIS, Justice.

This appeal involves a controversy between the City of St. Paul (hereafter the City) and Rein Recreation, Inc., formerly Watergate Marina, Inc., (hereafter Rein) concerning compensation for a condemned parcel of real estate along the Mississippi River in southwest St. Paul. The jury awarded $2,250,000 for the property. The City appealed contending primarily that the admission of certain evidence was error. We affirm.

In August 1969, Clayton G. Rein, Rein's sole shareholder, president, and chairman of the board of directors, along with a partner, acquired a 24.8 acre parcel of land on the Mississippi River near Davern Street in St. Paul. The land contains two river harbors and lies between Crosby Park and Hidden Falls. In 1970 the partnership also obtained a forty-year lease from the St. Paul Port Authority of an adjoining five-acre tract. Clayton Rein, a real estate developer since the 1940's, procured the property as part of a plan for building a luxury apartment complex consisting of two twenty-four story, 234-unit, high-rise apartment buildings, a marina, and an amenities building between the towers that was to include a restaurant, private dining rooms, a swimming pool, sauna, and other facilities. St. Paul city officials knew of the planned development since 1969.

The partnership was dissolved in 1971 when Clayton Rein bought out his partner's interest and formed Watergate Marina, Inc., later renamed Rein Recreation, Inc., which became the owner of the property. Another corporation, C. G. Rein Co., served as general contractor for the development.

Rein proceeded to plan the development after a 1969 market study indicated the existence of an immediate demand for 270 apartment units plus an additional future demand. The study was corroborated in 1976.

After acquiring the property, Rein obtained height clearance for the project from the Federal Aviation Agency. Under a maintenance clause from the Army Corps of Engineers, Rein was allowed to dredge the two river harbors pursuant to two existing permits. Dredged material was deposited as fill on the building sites.

On June 1, 1972, Rein received a special use permit allowing the construction of a large parking lot for use in conjunction with the other facilities. On December 29, 1972, a building permit was issued for one of the towers, the amenities building, marina, and parking lot. In 1973, under this permit, 800 piles were driven to a depth of ninety feet. These pilings were to be used solely for the first tower and amenities building. Some buildings and other facilities on the property were demolished or moved. In 1974 Rein upgraded the marina by building new concrete boat slips and a gas dock. During this period the marina was operated at a loss as a separate business. Rein also received a Pollution Control Agency permit for the discharge of air conditioner water and a Department of Natural Resources permit for a well.

Rein first became aware of opposition to the project in 1972. The land involved is located near the confluence of the Mississippi and Minnesota Rivers, and opponents

were concerned with the effect of the towers on the riverview. Possible alterations in the project were explored but were discarded as unfeasible.

In 1973 the legislature enacted the Critical Areas Act, Minn.Stat. ch. 116G (1978), which limits certain types of development thought to adversely affect the environment in designated areas. Later Minn.Reg. MEQC 51–57 (1974) were adopted to implement the act. The Metropolitan Council and the Minnesota Environmental Quality Board shortly thereafter recommended that the Mississippi River Corridor, which includes the land at issue, be declared a critical area. Legal notice of public hearings regarding the designation was issued on April 25, 1975. On October 18, 1976, Executive Order 130 (amended on November 5, 1976, by Executive Order 130A), 1 State Reg. 768, 796 (1976), designated the corridor as a critical area. Land in the corridor thereby became subject to restrictions prohibiting certain development, including high-rise buildings.

In August 1974 Rein was contacted by city officials who indicated that the City was interested in acquiring the property. Two months later Rein told the City that he was willing to halt work on the project if the City was serious. There was little further communication between the parties.

In March 1975 the St. Paul city attorney indicated that the building permit issued to Rein in 1972 had lapsed because one year had passed without work on the project. Rein sought and received a declaratory judgment holding that the permit remained valid.

The City formally began condemnation proceedings against the property in May 1976. Shortly thereafter a public purpose finding was made. The commissioners' report, filed on December 28, 1976, awarded $1,400,000 for the property—$1,350,000 for the land owned by Rein in fee and $50,000 for the leasehold. Because the commissioners felt that the Critical Areas Act likely

would prevent construction of a second tower and, in any event, a prudent investor would not erect the second tower, they based their award on the potential construction of only one tower.

■ On August 15, 1977, Rein commenced a declaratory judgment action to determine whether the Critical Areas Act and regulations limited development of the property. The reason for fixing Rein's right to develop his property was that the market value in eminent domain must be determined with reference to permissible uses under applicable land use regulations.[1] *See District of Columbia v. Lot 813 in Square 568*, 232 F.Supp. 714, 717 (D.D.C. 1974), *aff'd sub nom., Rubenstein v. District of Columbia*, 346 F.2d 833 (D.C.Cir.1975); *Note, The Admissibility of Zoning Ordinances as Evidence of Fair Market Value in Eminent Domain Proceedings*, 12 Syracuse L.Rev. 352, 354 (1961).

The district court found that on the date of notice of the proposed Mississippi River Corridor critical area designation, Rein had obtained building permits for all structures save the second tower. Construction of the second tower had not started nor had Rein received any official authorization regarding that tower. Moreover, Rein had shown no expenditure of monies directly in furtherance of the second tower and the district court felt that the demand for this type of apartment and the vagaries of the money market make conjectural any predictions regarding the eventual construction of the second tower. The court concluded that Rein had a vested right to complete the project, *except* that the right did not extend to the second tower.

Before the ensuing condemnation trial commenced, the district court made several evidentiary rulings. Excluded was evidence of the owner's expectations and speculations, potential profits, and development costs incurred by the owner. Evidence was permitted concerning the owner's plan for

---

1. At all relevant times Rein's development plan was consistent with applicable City of St. Paul zoning ordinances.

development, building permits, and certain other development permits. During the course of the trial the court also admitted evidence of Rein's progress toward completing the development.

In addition, before trial the City conceded that a luxury, high-rise apartment complex was the highest and best use of the property.

At trial, William Muske, an expert called by Rein, estimated the value of the condemned property, including the leasehold, at $2,793,000. The leasehold portion was appraised at $105,000. In forming his opinion, Muske considered land records, applicable land use regulations, similar properties, as well as the land and improvements including pilings. The valuation also embodied a reclamation of certain architectural fees that Muske felt a buyer would include in the purchase price as expenditures toward the highest and best use. He did not, however, consider out-of-pocket development costs or potential profit. He opined that while the Critical Areas Act would limit the height of a second apartment building, it would not significantly affect the value of the property because a large number of low-rise units could be constructed in spite of the act.

Joseph Bettendorf, another Rein expert, valued the property at $2,640,000. His appraisal excludes Rein's out-of-pocket costs, but takes into account certain costs incurred through 1974 such as engineering, construction, piling, and architectural fees which Bettendorf felt would be taken into account by a willing buyer and seller in agreeing on a price for the property.

Thomas J. Delaney, the City's expert, valued the property at $950,000 based on a potential for 400 apartment units. This figure encompasses certain costs such as engineering studies and plans as well as the land and improvements. The appraisal represents Delaney's supposition that a buyer would want to develop his own plan for the property. He later conceded, however, that the Critical Areas Act restrictions might compel a new owner to use Rein's existing plan as the only means of avoiding the act and constructing a high-rise.

One of the condemnation commissioners testified regarding the commissioners' valuation—$1,400,000, including $50,000 for the leasehold. This valuation, as stated earlier, was based on the potential construction of one 234-unit building. The jury awarded $2,250,000 for the property.

■ 1. The City challenges the award on several grounds. It argues foremost that the trial court erred by permitting relatively detailed testimony concerning the history of the planned development of the property, including the owner's plans for and progress toward development. Under the exceptional circumstances of this case, we disagree.

■ The only issue in this condemnation action was compensation, which is measured by market value at the time of taking.

Just compensation includes all elements of value which inhere in the property, but it does not exceed market value fairly determined. * * *

The determination [of value] is to be made in the light of all facts affecting the market value that such are shown by the evidence taken in connection with those of general notoriety as not to require proof.

*Minneapolis-St. Paul Sanitary Dist. v. Fitzpatrick*, 201 Minn. 442, 449–50, 277 N.W. 394, 398-99 (1937). The willing buyer-willing seller test applies, *Housing & Redev. Auth. v. Anderson*, 297 Minn. 355, 357, 211 N.W.2d 790, 792 (1973), and the value of the property is to be determined with reference to the highest and best use of the property under applicable zoning regulations. *State v. Independent Sch. Dist. No 31*, 266 Minn. 85, 96, 123 N.W.2d 121, 129 (1963).

■ Because the City admitted that the highest and best use of the property was a luxury, high-rise apartment complex, it contends that much of the evidence presented to the jury was irrelevant. We have held, however, that evidence regarding an admitted issue may nevertheless help the jury put a case in its proper perspective. For this

reason, the admission of such evidence is generally within the discretion of the trial court. *State v. Weber*, 272 Minn. 243, 251–52, 137 N.W.2d 527, 533–34 (1965); 9 J. Wigmore, Evidence § 2591 (3d ed. 1940).

Along the same lines the City also contends that much of the evidence should have been excluded under Minn.R.Evid. 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *.

The City argues that the evidence was not probative as to the fair market value of the property, or, if probative, the probative value was outweighed by the potential for prejudice or confusion.

The general rule regarding evidence relating to value in eminent domain cases has been phrased:

Subject to the caveat that such proof must be competent, relevant and material, evidence of any matter with would influence a prospective purchaser and seller in fixing the price at which a sale of the property could be consummated may be considered. With this criterion in mind, factors which would be ignored on a voluntary sale have no relevancy in fixing market value and are, therefore, inadmissible.

5 P. Nichols, *The Law of Eminent Domain* § 18.11 (3d ed.rev.1979) (footnotes omitted). Regarding potential uses and plans for developing property:

As bearing upon [issues of the market value of property in reference to its highest and best use], the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to affect market value. He cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion (or that of some expert) the land might be used, and base his estimate of value upon the profits which he would

expect to derive from the enterprise. In other words, he cannot capitalize the projected earnings of a non-existent enterprise or projected use. * * * If, however, the adaptability for [a] potential use is such as to have a positive influence upon present market value, it has been held competent for a witness to express an opinion as to the adaptability of the property for such purpose. A map or plan which graphically illustrates the potential use is equally admissible under such circumstances.

5 P. Nichols, *supra*, at § 18.11[2] (footnotes omitted).

In accord with these rules we have recognized that normally evidence of a landowner's particular plans and intentions regarding the development of his property is speculative and inadmissible. *See State v. Gannons, Inc.*, 275 Minn. 14, 145 N.W.2d 321 (1966). Nevertheless, to some extent questions regarding the admissibility of this type of evidence must rest within the discretion of the trial court. *See State v. LaBarre*, 255 Minn. 309, 316, 96 N.W.2d 642, 647 (1959). Such evidence, however, should only be received with great caution to avoid misleading the jury. *State v. Kohler*, 268 Minn. 77, 83, 128 N.W.2d 90, 94 (1964).

In light of the principles we have articulated and considering the peculiar status of this parcel at the time of condemnation, we conclude the City's argument has no merit. At the time of condemnation, in spite of existing land use regulations, Rein had a vested right to complete development of the property to the extent of one high-rise building. However, neither Rein nor any other potential owner was free to construct a high-rise building under *any* plan. The existence of Rein's vested right " 'does not mean that he can enlarge the [planned] building or change it in any way,' " but only that he "may proceed to finish the construction of this building according to [existing] plans." *Hawkinson v. County of Itasca*, 304 Minn. 367, 371–72, 231 N.W.2d 279, 281–82 (1975). This case, therefore, differs from the normal situation where any potential "willing buyer" of a property would be free

to discard the owner's existing plan and still achieve the property's highest and best use. Here, land use regulations would bar what all parties concede is the highest and best use—a luxury, high-rise apartment complex—under any design other than Rein's.

Because of this rather unique circumstance, Rein's plans and progress toward completing development assume a significance absent in the typical eminent domain case. The land use regulation posture of this tract places Rein's plans and progress beyond the category of mere speculation. They are instead factors likely to markedly influence a prospective purchaser and seller in fixing a purchase price for the property. *See State v. LaBarre*, 255 Minn. 309, 96 N.W.2d 642 (1959) (evidence of plans for remainder of partially completed and operating shopping center). We hold, therefore, that the trial court was within the limits of its discretion when it admitted the contested evidence.

 2. The City also argues that the trial court erred by admitting testimony from one of Rein's experts in violation of Minn.Stat. § 117.165, subd. 3 (1978), which provides:

> A party shall not be permitted at the trial, except for just cause shown, to use any expert witness on the matter of damages whose name, address and appraisal was not disclosed to the other party following a written demand.

The City made the required demand and received the information. The appraisal, however, was subsequently updated. The existence of the newer evaluation was disclosed in a routine exhibit list, but Rein failed to inform the City of the contents of the report. The City, after a request from Rein, failed to indicate that it was missing any of the items inventoried on the exhibit list. At trial the district court concluded that the City was surprised by the expert's testimony and gave the City several options, including an opportunity for a deposition, to allow it to adequately prepare for cross-examination. The City chose a short recess, during which it interviewed the appraiser. We find no need to determine whether the court in fact erred by admitting the expert's testimony because we conclude that any possible error was harmless.

 As to other alleged errors, our review of the record discloses that the jury charge accurately set forth the law concerning compensation for condemned property and that the jury was adequately cautioned regarding their role in the process. Furthermore, while the award was rather large, we have found nothing to indicate that the jury award includes payment for anything other than the fair market value of the property taking into account all incidents of value inherent in the property. We therefore affirm.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.

AMDAHL, J., not having been a member of the court at the time of the argument and submission, took no part in the consideration of this case.