The COUNTY OF RAMSEY,
petitioner, Respondent,

v.

Richard N. MILLER and Tanya B. Miller,
husband and wife,
Appellants,

City of New Brighton, County of Ramsey, et al., Respondents-Below.

No. 52030.

Supreme Court of Minnesota.

March 19, 1982.

Olson Gunn & Seran, Richard J. Gunn, Minneapolis, for appellants.

Tom Foley, County Atty., St. Paul, Peterson Bell & Converse and Robert C. Bell, St. Paul, for respondent.

YETKA, Justice.

Richard Miller appeals following a jury verdict on valuation in a condemnation proceeding in Ramsey County. We reverse and remand for a new trial.

Appellants owned approximately 79.9 acres of land in the City of New Brighton. The property is scenic wooded land along Rice Creek, with approximately 23 acres of high ground and the remaining 57 acres within the flood plain of Rice Creek. The surrounding area is a developed residential neighborhood. The City of New Brighton had constructed a bridge over Rice Creek through the center of the property and had installed public water and sewer facilities in preparation for development.

In 1975, Ramsey County began condemnation proceedings to acquire the subject property owned by appellants for a park and open space system. The district court found the proposed taking necessary and appointed commissioners who awarded damages of $415,000 in June 1976. Appellant owners appealed the award to Ramsey County District Court and, after a jury trial in June 1980, were awarded a judgment of $665,000. Appellants moved for additur or a new trial on the grounds, among others, that evidence supporting the development cost approach to determine market value was erroneously excluded and that other evidentiary rulings were erroneous. Respondent moved for remittitur. By order dated October 29, 1980, the court denied both motions, from which denial appellants appeal.

At trial on the issue of valuation, all witnesses agreed the highest and best use of the property was for residential development, but disagreed as to the number and types of residential units for which the property was suited. Opinions ranged from 20 units to 477 units. The applicable zoning would permit a maximum of 477 dwelling units under a planned residential development. Appellants were not permitted to introduce into evidence plats illustrating a proposed development plan. The parties introduced conflicting evidence on the support characteristics of the soil. The parties also introduced conflicting expert opinions on the likelihood of the granting by the Rice Creek Watershed District of the permit which would be required before a builder could put any fill in the flood plain.

Value witnesses expressed opinions of the value of the property as follows:

Witnesses for the county: $372,000; $280,000; and $415,000.

Witnesses for appellants: $2,027,250; $1,635,000; $2,330,000; and $1,700,000.

The county's witnesses were permitted to discuss comparable sales on which they based their opinions, but were prohibited from discussing specific prices of comparable sales except on cross-examination. Appellants' witnesses were permitted to describe in general the development cost approach by which they appraised the property, but were not permitted to discuss the numerical data or analyses underlying their opinions. Engineering testimony on the cost of development was also excluded.

Appellants' offer of proof not admitted into evidence establishes that in 1970 appellants submitted a proposed development plat to the city, on which the city deferred final action pending a study of the flood plain by the Army Corps of Engineers. Evidence was admitted that the Corps of Engineers' study, completed in November 1971, indicated that portions of the site would be under water in a 100-year flood. The court took judicial notice that on November 22, 1971, Ramsey County Commissioners passed a resolution authorizing acquisition of the property by negotiation or condemnation, but this evidence was not presented to the jury.

The issues on appeal are:

(1) Is specific numerical, analytical, and illustrative evidence supporting a development cost approach to valuation admissible?

(2) Was cross-examination of appellant landowner regarding the purchase price of the subject property prejudicial error to appellants?

(3) May a valuation witness be cross-examined regarding sales prices of comparable property not considered in his own valuation?

(4) Should appellants' proposed plat have been admitted as evidence of highest and best use?

(5) Must the court inform the jury of facts of which it took judicial notice?

(6) May the matter be remanded for consideration of whether the taking of the entire 80 acres was necessary?

Other errors alleged by appellants were not briefed to this court and, upon examination, are found to be without merit.

▇▇▇ To determine the fair market value of property in a condemnation proceeding "[a]ny competent evidence may be considered, if it legitimately bears upon the market value." *State v. Malecker*, 265 Minn. 1, 5, 120 N.W.2d 36, 38 (1963) (footnote omitted). The measure of compensation is the amount which a purchaser willing, but not required, to buy the property would pay to an owner willing, but not required, to sell it, taking into consideration the highest and best use to which the property can be put. *City of St. Paul v. Rein Recreation, Inc.*, 298 N.W.2d 46, 49 (Minn. 1980). In appraising land for which the highest and best use indisputably is residential subdivision, an appraiser must consider the property in the same manner as would a prospective purchaser of the undeveloped land for that purpose.

As the trial court recognized, courts have traditionally used three methods of determining fair market value of real property: (1) market data approach based on comparable sales; (2) income-capitalization approach; and (3) reproduction cost, less depreciation. *See* 4 Nichols, The Law of Eminent Domain § 12.32[3] (3d ed. rev. 1981); B. Palmer, Palmer's Manual of Condemnation Law § 40 (1961). Of these, only comparable sales have been employed for unimproved property. Appellants claim, however, that comparable sales on which to base an opinion as to value are unavailable. The subject property is uniquely situated with creek frontage, trees, and natural scenic beauty in an area of heavy housing demand and convenient location. The county's witnesses described sales of comparable parcels on which they based opinions of the value of the subject property; on cross-examination, however, the properties to which the comparisons were made were shown to lack desirable features of the subject property. Appellants' witnesses testified that the comparable properties were so different that comparison was meaningless, and reached their own valuation opinions using the development cost approach instead.

The development cost approach is designed to reflect, through cash flow analysis, the current price a developer-purchaser would be warranted in paying for the land, given the cost of developing it and the probable proceeds from the sale of developed sites.[1] American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 140 (7th ed. 1978).

Appellants' witnesses were permitted at trial to give their opinions as to the value of the property, as well as a general description of the development cost approach by which they appraised the property. They were not, however, permitted to discuss the numerical data or analyses underlying their opinions. We believe the evidence supporting the development cost approach should have been admitted in this case. In holding that the prejudicial speculation of this type of testimony outweighed its probative value, the trial court noted that "there is an inherently speculative quality to the developmental approach to market value when the subject acreage is essentially raw, undeveloped land." In reaching this position, the trial court relied on *State v. Malecker*, 265 Minn. 1, 120 N.W.2d 36 (1963).

In *Malecker*, the owner of a large tract of rural property sought to calculate his damages resulting from the condemnation of a portion of his property by aggregating the individual diminutions in value for each of the 131 lots on an unregistered plat of the remainder. In affirming the lower court's exclusion of evidence under this "lot method" approach, this court offered four major objections to this form of evaluation:

1. The fair market value should reflect the "selling [of] the entire property as one big unit rather than selling the individual lots separately."

2. The cost of improving and preparing the land cannot be ignored because the landowner would otherwise receive a windfall.

3. The jury should not be concerned "with all of the uncertain costs of advertising, brokers' commissions, taxes, utilities, grading, and improvements which a protracted lot-by-lot sales campaign would inevitably require."

4. The land involved was raw, undeveloped land as opposed to unoccupied city property which implies that some potentiality of development must be shown.

*Id.* at 3–8, 120 N.W.2d at 38–40.

The "development cost approach" clearly satisfies the first two requirements of *Malecker*—the market value calculation assumes a single sale of the property to a developer and makes corresponding adjustments for the costs of preparing, improving, and selling the property. *See* footnote 1 above, steps 5 through 8.

The third requirement seeks to protect juries by declaring that evidence of the underlying facts and data of the development cost approach is "per se" speculative

---

1. A typical "development cost" appraisal calculation would include these steps:
   1. Identify the economic bracket of the residents and check the range of sale prices of typical new homes in the area.
   2. By distribution, or comparison with lot sales in similar subdivisions, decide what figure represents a typical lot value in this category of development.
   3. Study and lay out a subdivision plan to develop typical lots.
   4. Project the total probable gross sale price for these lots.
   5. Estimate development costs to include:
      a. Engineering or other fees
      b. Cost of streets and utilities
      c. Advertising and cost of sales
   6. Estimate overhead and administrative costs to include:

   a. Taxes and inspection fees
   b. Financing fees and carrying costs
   7. Deduct these direct expenses for development from the figure derived in Step 4.
   8. Deduct an adequate profit allowance to provide incentive for the developer so that the calculated value of the raw land is exclusive of development profit. (Alternatively, profit may be provided for in the rate used for capitalization on the discounting process.)
   9. Deduct for time lag by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project.

   American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 148 (7th ed. 1978).

and thus inadmissible. However, as pointed out by Judge Parker's often quoted words:

Artificial rules of evidence which exclude from the consideration of the jurors matters which men consider in their everyday affairs hinder rather than help them at arriving at a just result. In no branch of the law is it more important to remember this, than in cases involving the valuation of property, where "at best, evidence of value is largely a matter of opinion".

*United States v. 25.406 Acres of Land,* 172 F.2d 990, 995 (4th Cir. 1949).

The developmental cost approach is recognized as an accepted appraisal practice. Howard Shenehon, past international president of the Society of Real Estate Appraisers, testified that the development cost approach was a nationally recognized approach which had been accepted by lending institutions, assessors, developers, and builders. Peter Fisher, chairman of the Appraisal Review Committee of the American Institute of Real Estate Appraisers, described the development cost approach as "extremely reliable" and one which is relied upon by the Federal Home Loan Bank Board as well as by Midwest Federal Bank where he is employed. One of respondent's appraisal experts, James M. McKenzie, acknowledged that this was an "acceptable procedure when appraising development land."

The modern trend favors admissibility of all relevant evidence. *See* Minn.R.Evid. 102, 402, 403 & Comments. Although Minn. R.Evid. 705 does allow an expert witness to give his opinion without first disclosing the facts or data upon which it is based, the rule clearly does not prohibit the introduction of such testimony. It seems a bit incongruous to prohibit an expert from testifying as to these matters on direct examination because they might confuse the jury while, at the same time, permitting such testimony on cross-examination when the clarification of the expert's position is clearly not always foremost in the questioner's mind. While the trial court may always exclude relevant evidence if its probative value is "substantially outweighed" by the danger of confusion of the issues, Minn.R. Evid. 403, we believe the careful use of preliminary jury instructions could do much to reduce any potential for confusion. *See* Minn.R.Civ.P. 39.03. The automatic exclusion of the underlying facts and data which support a "development cost approach" appraisal is contrary to the modern theme of the rules of evidence.

In *Malecker,* the court distinguished *Board of County Comm'rs v. St. Paul & S.C.R.R.,* 28 Minn. 503, 11 N.W. 73 (1881), by noting that the lot method of appraisal was permissible in that case because city property was involved which was capable of being subdivided. The land involved in *Malecker,* however, was approximately 110 acres of rural property that had no utilities except electricity, no improvements, and roads that were only graded and graveled. The court thus suggested that some showing of a current potential for subdivision and sale was necessary.

Federal cases which have approved the development cost approach have also required some showing of minimal practicality. *See, e.g., United States v. 47.3096 Acres,* 583 F.2d 270 (6th Cir. 1978) (valuation testimony based on hypothesized subdivision is excludible if development not shown to be reasonably probable); *United States v. 100 Acres of Land,* 468 F.2d 1261 (9th Cir. 1972), *cert. denied,* 414 U.S. 864, 94 S.Ct. 37, 38 L.Ed.2d 84 (1973) (the subject property was generally unimproved, but it was part of a larger tract being developed and was the next area to be completed); *United States v. 147.47 Acres,* 352 F.Supp. 1055 (M.D.Pa.1972) (substantial physical work and actual sales of lots had taken place). This satisfies the requirement that "[e]lements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, *are not fairly shown to be reasonably probable,* should be excluded from consideration * * *." *Olson v. United States,* 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934) (emphasis added).

The factors which indicate if an event is reasonably probable are those that "fairly might be brought forward and reasonably be given substantial weight" in "fair nego-

tiations between an owner willing to sell and a purchaser desiring to buy." *Id.* at 257, 54 S.Ct. at 709. With the use of computers, sophisticated buyers and sellers are able to consider accurately a myriad of variables in arriving at a current market value for undeveloped land. The factors involved in the development cost approach are clearly those that are "brought forward" and given "substantial weight" in "fair negotiations" between a willing seller and a willing buyer.

█ We take the position that, in light of current practices in the real estate area, the use of computer technology and the approach to a more liberal introduction of evidence as suggested by our new rules of evidence adopted in 1977, it was error to disallow the development cost approach in this case. We go several steps further. Since all relevant evidence relating to market value should be admissible, we hold that specific prices of comparable sales may be used on both direct testimony of witnesses, as well as on cross-examination, unless that evidence containing comparable sales is so remote in time as to be irrelevant. We see no reason to allow an expert to testify as to value and then permit the very bases for his testimony to come out only in cross-examination, if at all. Likewise, we believe that the assessed valuation of the property as shown in the county auditor's records should be admissible as bearing upon the fair market value of the property. Again, subject to the objection of the possible remoteness of time, the owner's acquisition costs and money expended for improvements should be admissible on both direct or cross-examination.

█ Finally, while the development cost approach will hereafter be permissible, specific numerical, analytical and illustrative evidence supporting the development cost approach appraisal will be allowed only if the party introducing such evidence can lay a proper foundation to show that (a) the land is ripe for development; (b) the owner can reasonably expect to secure the necessary zoning and other permits required for the development to take place; and (c) the development will not take place at too re-mote a time. To the extent that *Malecker* may be inconsistent, it is overruled.

█ In this particular case, therefore, appellants should have been permitted to introduce the planned development and proposed plat through expert witnesses. They would be required to prove that the landfill contemplated would be normally and reasonably permissible under either state statutes or watershed district regulations. The county board resolution should have been submitted to the jury because of the influence it might have had on the possibility that the permits needed for the landfill would have been issued.

We do not deem the final issue as to whether there was a necessity to acquire the entire 80 acres to have much merit. Appellants' own counsel did not seriously argue that point at the hearing held on initial petition for condemnation and has virtually conceded there was a public use involved.

The case is reversed and remanded for a new trial not inconsistent with this opinion.

KELLEY, J., took no part in the consideration or decision of this case.