**PORT AUTHORITY OF the CITY OF ST. PAUL, Appellant,**

v.

**Anthony J. ENGLUND, et al., Respondents.**

**No. C3-90-1516.**

Court of Appeals of Minnesota.

Jan. 8, 1991.

Terrence J. Garvey, Port Authority Corp. Counsel, John F. Bannigan, Jr., James J. Hanton, Bannigan & Kelly, P.A., St. Paul, for appellant.

Robert J. Tansey, Jr., Kristin Nering Lockhart, Robins, Kaplan, Miller & Ciresi, Minneapolis, for respondents.

Considered and decided by HUSPENI, P.J., and DAVIES and NIERENGARTEN,* JJ.

## OPINION

DAVIES, Judge.

Appellant St. Paul Port Authority challenges the jury's award for condemned property, alleging that it is excessive, that the "development cost" real estate valua-

---

* Wm. J. Nierengarten, retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

tion method is inapplicable to this case, and that the trial court erroneously admitted evidence under that theory. We affirm.

## FACTS

During the spring of 1985 officers of respondent CSM Corporation and Knox Lumber Company discussed business ventures, including Knox's plan to relocate one of its stores from one location in St. Paul's Midway to another. Respondent learned of the U.S. Steel Midway warehouse property and negotiated to buy the property. The purchase closed in June 1985.

Thereafter, respondent discussed use of the property with Knox. Knox became interested and developed a plan which used part of a large warehouse on the property. A contractor submitted an estimate of $842,000 for improvements to the warehouse as indicated on preliminary renovation plans prepared by Knox. Appellant Port Authority, knowing that respondent hoped to enter a long-term lease with Knox, approved respondent's request for financing to renovate the property.

On August 2, 1985, the Port Authority, having had a change of mind, indicated it intended to condemn the property and, to discourage respondent from entering any long-term leases, sent respondent a letter including the following:

> Probably the most counterproductive move you could make at this time, as far as our interest and the city is concerned, is to make a commitment to a lumber yard in this area. If we are going to lend the project any of our eminent domain powers and our support for tax increment financing, any leases that you might make on the U.S. Steel facility that (a) prevented that facility from being razed, or (b) put into position a lease which would require compensation for relocation costs would be a deal killer.

On April 10, 1986, the Port Authority initiated condemnation proceedings. The trial court ruled that the date of the taking was May 26, 1988, at which time the warehouse was occupied by a number of short-term "cold storage" tenants. At a July 1988 hearing before court appointed commissioners appellant argued that the property was worth $1.425 million; respondent claimed it was worth $3.2 million. The commissioners awarded respondent $1.7 million. Respondent appealed to district court.

Prior to trying valuation, the trial court issued a pretrial order barring respondent from referring to "evidence of any lease with Knox Lumber Company which was never executed." Nonetheless, references were made throughout the trial to the Knox plan. For example, the contractor testified to the estimated renovation costs of $842,000 to implement the Knox plans.

At trial numerous experts for both sides generally agreed that the highest and best use of the property was that of a bulk retail or wholesale user, and that the typical lease for such a property was long-term. Respondent's various experts projected the value of the property, after the improvement described in the Knox plans, to be between $3.2 million and $4.5 million. One of respondent's experts testified with enough detail on development costs that he said they should include not only those explicitly associated with the Knox plans but also listed other "soft costs." Appellant's experts estimated the value of the property to be $1.4 to $1.5 million. They also said a prudent long-term tenant probably would not enter a lease on a property that was about to be condemned and that the $842,000 renovation estimate was low.

The jury awarded respondent $2,665,000 and the Port Authority appeals.

## ISSUES

1. Is the "development cost" approach for real estate valuation acceptable, and is it applicable to this case?

2. Were the trial court's evidentiary rulings an abuse of discretion?

3. Was the jury's valuation excessive?

## ANALYSIS

The state constitution requires that "just compensation" be paid for condemned land. *See* Minn. Const. art. 1, § 13.

Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined.

\* \* \* \* \* \*

The determination [of value] is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof.

*Olson v. United States,* 292 U.S. 246, 255, 257, 54 S.Ct. 704, 708, 709, 78 L.Ed. 1236 (1934); *see also City of St. Paul v. Rein Recreation, Inc.,* 298 N.W.2d 46, 49 (Minn. 1980); *Minneapolis–St. Paul Sanitary Dist. v. Fitzpatrick,* 201 Minn. 442, 449–50, 277 N.W. 394, 398–99 (1937). Specifically:

[T]he value of the property is to be determined with reference to the highest and best use of the property under applicable zoning regulations.

*Rein,* 298 N.W.2d at 49. "[C]ondemnation damages are assessed as of the date of the commission award." *City of St. Louis Park v. Almor Co.,* 313 N.W.2d 606, 610 (Minn.1981).

### I.

In *Ramsey County v. Miller,* 316 N.W.2d 917, 919 (Minn.1982), the supreme court discussed three traditional methods of real estate valuation. *Miller* then went on to discuss a "development cost" approach to real estate valuation which

is designed to reflect, through cash flow analysis, the current price a development-purchaser would be warranted in paying for the land, given the cost of developing it and the probable proceeds from the sale of developed sites.

*Miller,* 316 N.W.2d at 920.

The risk in this method, and in this case, is that speculative value will inflate the award. This concern also prompted the trial court here to fear the effect of and to limit testimony about the Knox plan. Condemnation value must be based on reality, not dreams. Therefore, the *Miller* court concluded:

[S]pecific numerical, analytical and illustrative evidence supporting the develop-

ment cost approach appraisal will be allowed only if the party introducing such evidence can lay a proper foundation to show that (a) the land is ripe for development; (b) the owner can reasonably expect to secure the necessary zoning and other permits required for the development to take place; and (c) the development will not take place at too remote a time.

*Miller,* 316 N.W.2d at 922. The Port Authority challenges use of the development cost approach in this case. We believe, however, that the three safeguards required by *Miller* are met here and that the development cost approach is appropriate.

### Prerequisites of Ripeness and Zoning

■ This central city property was ripe for development and is zoned for the use upon which value was based. In *Miller* a residential development was platted in a flood plain. While the city had constructed a bridge and installed both sewer and water facilities "in preparation for development," there was conflicting expert evidence regarding the soil's support characteristics and whether the appropriate permits would be granted to allow the building company to put fill in the flood plain. *See Miller,* 316 N.W.2d at 918. Some development is as likely here as the development in *Miller.*

Appellant argues that the development cost approach is implicitly inapplicable to a developed urban, commercial facility. We disagree. Neither the supreme court's description of the development cost approach nor the method's explicit evidentiary requirements demand that the property in question be undeveloped initially. Additionally, *Miller* referred to several federal cases "which have approved the development cost approach." *See generally Miller,* 316 N.W.2d at 921 (citing *United States v. 47.3096 Acres Etc. in Oxford Township,* 583 F.2d 270 (6th Cir.1978); *United States v. 100 Acres of Land,* 468 F.2d 1261 (9th Cir.1972) *cert. denied* 414 U.S. 864, 94 S.Ct. 37, 38 L.Ed.2d 84 (1973); *United States v. 147.47 Acres of Land,* 352 F.Supp. 1055 (M.D.Pa.1972)). The most re-

cent of these cases refers to a "lot method" of appraisal and states:

> There is some authority for the proposition that valuation evidence based on the lot method of appraisal *should never be admitted in condemnation cases involving unimproved raw land.*

*Oxford*, 583 F.2d at 271–72 (emphasis added).

*Oxford's* emphasis on the development and its credible costs is consistent with the supreme court's enunciated concern in *Miller:*

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, *are not fairly shown to be reasonably probable,* should be excluded from consideration * * *.

*Miller*, 316 N.W.2d at 921 (quoting *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934)) (emphasis added in *Miller*). Further:

> · The factors which indicate if an event is reasonably probable are those that "fairly might be brought forward and reasonably be given substantial weight" in "fair negotiations between an owner willing to sell and a purchaser desiring to buy." * * * The factors involved in the development cost approach are clearly those that are "brought forward" and given "substantial weight" in "fair negotiations" between a willing seller and a willing buyer.

*Miller*, 316 N.W.2d at 921–22 (quoting *Olson*, 292 U.S. at 257, 54 S.Ct. at 709).

The primary question regarding the development cost approach evident in *Miller* is not whether the subject land is developed, but the likelihood of the proposed development, the probability of its associated costs, and how that development would be treated were the land actually sold. Because this record suggests a significant probability that the land in question would be developed for a particular purpose and at a particular cost, and because such a development would weigh heavily in an actual sale of the subject property, we conclude that the "cost development" valuation method is applicable to the instant case even though the subject property already had a building on it.

### Not Remote In Time

As to whether development was imminent, as required by *Miller*, the president of respondent CSM testified:

> [Interest in the property] was overwhelming. We received approximately fifteen calls a day for use of that property. * * * We had retailers, industrial uses, steel users, again in the retail area we had lumberyards, we had wholesale food operations, we had the wholesale warehouse type people, we had different grain companies calling us for use, we had a TV studio call us for use, a railroad company, and a number of steel companies interested * * *.

Appellant argues, however, that respondent's projected development was "speculative" and could not be used to show that development will occur in the near future. Until something is finished there is always some uncertainty of completion. But the instant facts do not suggest that some prompt development was less likely here than in *Miller.*

Still, does the nascent Knox deal have any relevance? Here, Knox was planning to relocate one of its Midway area stores to another Midway location, Knox looked at the subject property, Knox and respondent discussed renovation and lease possibilities, respondent sought and obtained appellant's approval for renovation financing, Knox had preliminary renovation plans drawn up, and respondent obtained a renovation cost estimate from a contractor based on those plans. Then Knox and respondent learned of the subject property's potential condemnation. Only then did Knox relocate elsewhere in the Midway area. We conclude that the third *Miller* prerequisite is also satisfied.

### II.

Appellant argues the trial court abused its discretion in admitting testimony regarding respondent's particular plans and

by allowing statements regarding the conduct of appellant.[1]

## A. *Evidence of Particular Plans*

■ In making the highest and best use analysis:

> [A] landowner's plan of a proposed development is admissible for the limited purpose of illustrating a way in which the land in question could be adapted to its highest and best use, provided it appears that the likelihood of a demand for the property for that purpose is such as to affect market value, but the property owner cannot go further "and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise."

*State v. Kohler*, 268 Minn. 77, 83, 128 N.W.2d 90, 94 (1964) (quoting 5 Nichols, Eminent Domain (3 ed.) § 18.11[2] p. 159). By contrast, *Miller* states "[t]he modern trend favors admissibility of all relevant evidence." *Miller*, 316 N.W.2d at 921; *see also id.* at 922 ("Since all relevant evidence relating to market value should be admissible * * *.").

To the extent that *Miller's* admissibility standard is less stringent than the *Kohler* standard, it is so at least partially because of post-*Kohler* developments:

> [W]e take the position that, in light of current practices in the real estate area, the use of computer technology and the approach to a more liberal introduction of evidence as suggested by our new rules of evidence adopted in 1977, it was error to disallow the development cost approach in this case.

*Miller*, 316 N.W.2d at 922. The trial court recognized that the *Miller* approach was different. In evaluating what evidence is admissible under *Miller* the trial court stated: "I think the supreme[ ] [court] came up with what appears to be a new area in this area * * *." Thus, an alleged failure to comply strictly with the *Kohler* standard is not fatal to evidentiary rulings in the development cost context, especially where the trial court was cognizant of a difference between the *Kohler* and *Miller* admissibility standards.

■ We also disagree with appellant's allegation that admission of evidence regarding respondent's renovation plans and lease was error because that evidence was first precluded by the pretrial order. The pretrial order does not totally forbid admission of the contested evidence at trial:

> The Court *at this time* declines to make a ruling in advance as to the specific items of evidence in this area.

(Emphasis added.)

Under *Miller* "*specific* numerical, analytical and illustrative evidence supporting the development cost approach appraisal will be allowed * * *." *Miller*, 316 N.W.2d at 922 (emphasis added). We believe the renovation plans and lease could be seen as the specific evidence allowed by *Miller*. Indeed, because the cost development approach requires consideration of "the cost of developing [the site] *and* the probable proceeds from the sale of developed sites," *Miller*, 316 N.W.2d at 920 (emphasis added), the plans and lease could be seen as necessary to complete the cost development analysis in this case.

Appellant's argument that no expert witness used the development cost approach is also unpersuasive. One of respondent's witnesses projected the gross value of the improved property and subtracted the costs of improvement from that value. That is the foundation of the development cost ap-

---

**1.** After the jury award, appellant's motion for a judgment notwithstanding the verdict on grounds that the jury was allowed to consider inadmissible evidence was denied. We disagree with respondent's argument that the propriety of this denial is not properly before this court. This court has stated:

> Eminent domain proceedings are "special proceedings." The proper appeal in such proceedings is generally from the final decision, order or judgment. In special proceedings, a motion for a new trial is *not* needed to preserve issues for appellate review, and an order denying such a motion is not appealable.

*Park & Recreation of Minneapolis v. Bolander*, 436 N.W.2d 481, 482 (Minn.App.1989) (citations omitted) (emphasis added).

proach to valuation. Also a witness for appellant testified that it was that type of calculation that produced the original award.

### B. *Conduct of Appellant*

█ Appellant argues that the valuation issue was prejudiced by the trial court's admission of evidence regarding appellant's alleged interference with respondent's pre-condemnation business. We disagree.

Experts testified that the best use of the subject property would be some type of bulk retail center and that the typical lease for such an establishment was long term. Also, the costs of improving the facility to this highest and best use were substantial. Therefore, whether a reasonable tenant seeking to develop the property would incur such costs could be seen as related to whether a long lease could be secured. Logically, a tenant's desire to enter a long-term lease on property requiring significant improvement, but which might be condemned shortly, could be limited. A jury could believe the potential condemnation explained why the lease between respondent and Knox was not executed and why the property was never improved. Without evidence allowing the inference that Knox was "scared away" by the condemnation, the development of respondent's property could be seen as appearing wholly speculative. The evidence on this record suggests the contrary.

### III.

Appellant finally argues that the jury's award was "excessive as a result of the admission of speculative and irrelevant testimony." Considering the evidence and the jury's broad discretion in valuation, the ultimate award of $2.665 million is not so unreasonable as to require a new trial.

### DECISION

We conclude that the trial court did not err in allowing use of the cost development approach to real estate valuation in this case. The trial court's evidentiary rulings were not an abuse of discretion nor was the jury's award excessive.

Affirmed.