James H. ALEVIZOS, et al., Petitioners,

Frank L. Ario, et al., petitioners, Appellants,

v.

METROPOLITAN AIRPORTS COMMISSION, Respondent.

No. 51059.

Supreme Court of Minnesota.

March 26, 1982.

Olson, Gunn & Seran, Richard J. Gunn, William D. Gunn and Russell A. Sorenson, Minneapolis, for appellants.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Gordon Shepard, Michael Berens and Madge S. Thorsen, Minneapolis, for respondent.

Minnesota Pollution Control Agency, Roseville, amicus.

SIMONETT, Justice.

This is an appeal by residents near the St. Paul-Minneapolis International Airport from a district court order and judgment denying a writ of mandamus for inverse condemnation of an "avigational easement." While we find that the trial court properly followed the procedures and the standard for this kind of proceeding, we also conclude that petitioners were deprived of a jury trial, which they had not waived, and, therefore, a new trial is necessary.

The case began in 1970 as a class action against the Metropolitan Airports Commission (MAC) for inverse condemnation, when residents in the area claimed an unconstitutional taking of avigational easements.[1] In *Alevizos v. Metropolitan Airports Commission*, 298 Minn. 471, 216 N.W.2d 651 (1974) (*Alevizos I*), this court held a class action was not appropriate. We remanded and set out a standard for establishing an unconstitutional taking, which provided that:

> [W]e * * * will give relief to any property owner who can show a direct and substantial invasion of his property rights

of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property.

298 Minn. at 487, 216 N.W.2d at 662.

The suit of Frank L. and Georgette Ario was advanced as a test case and tried to the district court, without a jury, in early 1979. The trial court, after a careful consideration of the record, concluded that there was a "substantial invasion of property rights of such magnitude that [the Arios] are deprived of the practical enjoyment of their property." The court found, too, that the aircraft flights over and near the Arios' home constituted a repeated and aggravated invasion of their property rights and that there was a reasonable probability this invasion would continue in the future.[2] On appeal, these findings and conclusions are not disputed. The dispute here arises because the trial court also concluded that "[t]he invasion has not resulted in a definite and measurable diminution in the market value of the petitioners' property." Consequently, the writ was denied.

On appeal petitioners claim that the evidence establishes their right to inverse condemnation as a matter of law; that the trial court made an incorrect evidentiary ruling and misapplied the *Alevizos I* standard; and that, finally, they were deprived of a jury trial. While petitioners had successfully opposed MAC's initial request for a jury, they claim this was not a waiver as they were misled by language in *Alevizos I* as to the jury's role in proceedings of this kind. To discuss these issues, we must first describe the factual setting.

Mr. and Mrs. Ario live at 5640 11th Avenue South in Minneapolis, where Mr. Ario

---

1. The proposed class action alleged that the property affected would include approximately 27,565 homes, apartments, churches, places of business and other buildings in Hennepin, Ramsey and Dakota Counties.

2. After *Alevizos I* in 1974, two events occurred which might have alleviated airport noise. First, plans for a new major airport were considered, but these plans were abandoned in 1977. Second, the Metropolitan Aircraft Sound Abatement Council, organized in 1969 and consisting of local residents, airline officials and MAC, developed and implemented a 17-point program for noise abatement. This program included a preferential runway system, a voluntary night curfew, and different landing and takeoff procedures. Even so, the trial court found there is little more that MAC can do to lessen noise below current levels for the Arios.

teaches and coaches at nearby Washburn High School. The Arios have lived at this address since February 1962 and do not want to sell or move away from the neighborhood. The house was purchased for $21,600 in 1962 and, as of October 1, 1978 (the stipulated date of valuation), was worth $58,000 to $69,000. The Arios were aware of the airport in the vicinity when they bought the house but did not give this serious consideration, since it was their impression that airplanes flew over much of the south Minneapolis area where they wanted to live. Also, in 1962, few large jet aircraft used the airport.

The Ario residence is located about two city blocks from the northwest corner of the airport property and is now approximately 8,000 feet from the end of runway 11 Right–29 Left. Aircraft landing on this runway usually follow an imaginary centerline that runs between 350 and 500 feet south of the Ario property. Some aircraft fly directly over and some fly somewhat to the north of their property. The instrument landing system glide slope is approximately 475 to 500 feet above ground level at the point of the Ario residence.

Much of plaintiffs' evidence of the invasive nature of the overflights is anecdotal. Among other things, the Arios and their neighbors testified that, when landing, the sound of the plane is like a high-pitched whine; on takeoff, there is a deep rumbling roar. If the aircraft is overhead, conversations stop, inside and outside the house. Windows and walls vibrate, dishes rattle, and pictures turn aslant. Several people testified that phone conversations must stop while the aircraft passes overhead. Television pictures flip and roll from electrical interference. Outdoor activities are moved indoors when overflights are frequent. Reading and writing activities, as well as the family dinner hour, are interrupted. Sleep is often disturbed.

The Arios became increasingly aware of the aircraft noise in the late 1960's, when larger, noisier aircraft began using the airport. Runway 11 Right–29 Left is the longest runway and the sole runway fully instrumented to handle landing aircraft. It is also the runway closest to the Ario home. Runway 11 Left–29 Right is parallel to and 3,800 feet from this first runway. Together, says Raymond Glumack, executive director of MAC, these two runways are the "heart throb" of the airport operation, and they account for takeoffs over the Ario neighborhood 24.6% of the time and landings in the same area 17.3% of the time. Daily during the 3 peak hours, overflights can occur every 2 to 3 minutes at the Ario residence.

Noise levels monitored by the Minnesota Pollution Control Agency (PCA) at the Ario residence, as well as in other Minneapolis areas, demonstrated, as the trial court observed, that the noise intensity experienced by petitioners is greater than that experienced by the public generally.

On the critical issue of whether the admitted noise problems translated into a diminution of market value, seven witnesses testified, three for petitioners and four for respondent MAC.

Collin Viesselman, an appraiser for the Veterans Administration, testified for petitioners; he made no formal appraisal but said, in his opinion, "[t]here is a definite difference in value" for homes in the Ario neighborhood. Howard Shenehon, an appraiser, also testified for the Arios. He made no appraisal of the Ario house, but, based on his familiarity with general studies in the south Minneapolis area, he gave an opinion that the Ario property would be reduced in value from 5 to 15%.

Petitioners' chief appraisal expert was Culver LaSalle, who conducted a formal appraisal, using both the market and cost approaches to arrive at a value for the Ario house of $62,500. To determine if this figure represented a loss of market value due to airport noise, LaSalle then compared two groups of homes, Group I near the airport and Group II at the west edge of Minneapolis, near Edina. LaSalle concluded the Ario home would be worth 10 to 15% more if there were no airport noise intrusion. This would put the value of the Ario home at about $70,000, so the appraised value of

$62,500 represented a diminution in value of $7,500. On cross-examination, however, La-Salle admitted there were differences other than airport noise between the Group I and Group II neighborhoods. The crosstown highway runs through Group I, creating several dead end streets; no comparable traffic pattern exists in Group II. Homes around Group I tend to be older and smaller. Homes around Group II tend to improve in quality, especially on the Edina border. Group II is quite close to Southdale Shopping Center, and there is no comparable commercial center in Group I.

Louis Ried Schott and Stanley Miller, two representatives of an appraisal research firm, testified for respondent. Schott and Miller selected four study areas from which each collected his own sales data. Schott conducted a computer regression analysis of noise impact on the Ario house; Miller conducted a conventional market approach appraisal. Other than the selection of common study areas, Schott and Miller conducted their studies independently.

The four study areas, chosen for their comparability to the Ario neighborhood, included two neighborhoods in western Minneapolis near Edina, one area surrounding the Ario home, and a fourth neighborhood in northeast Minneapolis near St. Anthony Village. A computer printout of 1,819 sales made between 1971 and 1978 was then obtained from the city assessor's office. This was refined to a final sample total of 786. All of these homes were then physically inspected and photographed. Using a "regression analysis," Schott and his staff isolated six factors as having the greatest influence in predicting market value.[3] While aircraft noise was a variable factored into the analysis, it proved to have no measurable, or at best a negligible, effect on market value.

Miller conducted a conventional market appraisal of the Ario home, using comparable sales from the same four study areas used in the computer regression analysis.[4] In his opinion, the Ario home could be placed in any one of the study control areas and sold for roughly the same price. "So," Miller concluded, "I don't believe the market is measuring noise."

Peter Patchin was respondent's last appraisal expert. Patchin used both the cost and market approaches in conducting a formal appraisal. He surveyed a much wider area than the other experts, selecting 100 sales of three- and four-bedroom, story-and-a-half, expansion bungalow houses through-

3. In a regression analysis an equation is sought which indicates, for appraisal purposes, a predicted selling price for a property. It is basically a trial and error process, feeding different factors into the computer until an accurate formula is derived. Here, noise, using levels assumed to be continuous and uniform in intensity over the study period of 1971–78, was a factor put in the data base for analysis. If noise had an impact on market value, this would be expected to show up in the formula.

Schott testified his computer runs checked 26 different factors. His final formula isolated six significant factors, namely, gross building area, number of fireplaces, age, finished basement area, size of lot and time (time meaning the number of months between the date of sale and the date of valuation). Among the 20 factors discarded was number of baths and bedrooms, and petitioners question the discard of such seemingly highly relevant items. These factors, however, as respondent points out, were found to correlate highly to square footage building area and so were reflected in that factor, and, consequently, were not significant, independent variables.

4. Areas 1, 2, 3 and 4 were 1.5, 3, 4 and 7.5 miles, respectively, from the airport. Noise levels of 70 (area 1), 65 (area 2), 58 (area 3) and 58 (area 4) dBA on the $L_{10}$ scale were measured and used in the appraisal. The state daytime standard, by comparison, is $L_{10}$ dBA, which means noise should not exceed 65 decibels on the A scale (a scale which measures the human response to sound) for more than 10% of an hour.

Miller selected four comparables each in areas 1, 2 and 3. He used five comparables in area 4. Converting each sale figure to a price per square foot, the mean figures were: area 1 (Ario neighborhood)—$46.20; area 2—$45.11; area 3—$48.11; and area 4—$45.88.

Miller also conducted a market appraisal of the Ario home in its own neighborhood, arriving at a market value between $64,500 and $66,500. He found that both appreciation trends and turnover trends were favorable in the Ario neighborhood. He conceded, however, the Ario neighborhood (area 1) had approximately 15% less appreciation in home values during the 1971–78 period than homes in areas 2 and 3.

out south Minneapolis and part of St. Louis Park. All sales occurred within 12 months of his study. From this selection, Patchin then took eight homes in the Ario neighborhood and eight homes from elsewhere in the study group and had these homes tested for noise. The $L_{10}$ readings (noise levels exceeded for more than 10% of the hour) in the Ario neighborhood ranged in the high sixties and low seventies decibels; the other areas registered levels in the low sixties. Deliberately not making any adjustment for noise, Patchin's study valued the Ario home in its own neighborhood at $69,000, while in the other three "low noise" neighborhoods it would be worth $66,000 to $68,000. Since the values were all within a normal correlation and the Ario home was worth more in its own neighborhood than in the other three test areas, Patchin concluded "evidence of any damage due to airport overflights was inconclusive."

Finally, respondent called Mark Johnson, a successful realtor who lives about 4 blocks from the Ario residence and who, between 1973 and 1978, listed and sold 67 properties in the Ario neighborhood; his closest competitor had listed 16. Johnson testified that, in his opinion, airport noise did not affect the value of homes in the Ario neighborhood; that the percentage rate of appreciation has remained on a par with that of Minneapolis; that listings rarely expire without a sale; and that the turnover rate is equal to other Minneapolis areas. The trial court found that Johnson's testimony confirmed the conclusions by respondent's appraisers.

■ 1. Petitioners raise four arguments. They first contend that the evidence establishes a constitutional taking as a matter of law so that mandamus must issue; at the very least, they contend, the trial court's finding of no diminution in market value attributable to airport noise is clearly erroneous. Minn.R.Civ.P. 52.01. We disagree. The evidence on any market value diminution and what may have caused it was in dispute and for the trier of fact—in this instance, the trial judge—to resolve.

Petitioners' three experts testified to a diminution in market value, but only LaSalle conducted a market value study in support of his opinion. LaSalle's opinion of a 10 to 15% depreciation in the value of the Ario property due to noise was based on comparison of "similar" neighborhoods, but the neighborhoods were dissimilar in several respects and his testimony on noise as the cause of the diminution was subject to doubt. The market studies show that many factors other than airport noise may affect a property's market value. As the trial court observed, simply to show a diminution in market value in the presence of airport noise does not in itself prove the diminution was caused by the noise.

The trial court found respondent's evidence more persuasive, and, if the trial court were to be the sole trier of fact, we could not say it was erroneous for it to have found as it did. LaSalle used a data base of just five sales for his appraisal and 45 sales for his noise impact study. On the other hand, respondent's expert, Schott, analyzed 786 sales from a data base of 1,819 sales and, using the computer regression analysis, checked 26 factors for sales price predictability. Respondent's second expert, Miller, began with the same data base of 1,819 sales and selected 21 "comparables" in his noise impact study and five of these were used in his appraisal. Patchin, respondent's third expert, used eight comparables for his appraisal and 52 sales for his noise impact study.

Petitioners argue the trial court's findings were inconsistent and contrary to common sense. It does seem strange to have a record before us of a substantial invasion of property rights by reason of airport noise as well as evidence that the noise has not caused any definite and measurable decrease in market value. Yet, as Peter Patchin put it on cross-examination:

Well, we found there certainly was aircraft noise; no one can deny that, and it's a nuisance; I don't think anybody can deny that. But whether—our problem was, did it reflect itself into value. And we were unable to prove that it did or did

not. So we think that, that as far as we can find there is no damage out of the market.

Petitioners simply failed to prove their case to the trier of fact. The *Alevizos I* standard has two parts, substantial invasion and measurable diminution. As the case was tried, petitioners met their burden on the first part but not on the second.

■ 2. Second, petitioners claim evidence of prior sales was inadmissible. We disagree, and since this issue will come up again on retrial, we will treat it here. During the mandamus trial, over petitioners' continuing objections, the trial court received testimony from respondent's appraisers as to actual sales prices of comparable properties. Petitioners point out that this court has consistently excluded evidence of comparable sales prices as substantive evidence in eminent domain proceedings. *See Silver Lake Apartments, Inc. v. County of Olmsted*, 295 Minn. 548, 204 N.W.2d 415 (1973); *Lord v. Winiecki*, 263 Minn. 86, 115 N.W.2d 724 (1962); and *Minneapolis-St. Paul Sanitary District v. Fitzpatrick*, 201 Minn. 442, 277 N.W. 394 (1937). Apparently Minnesota's rule of exclusion in eminent domain proceedings is in the minority. *See* Annot., 85 A.L.R.2d 110 (1962). Respondent urges that we abandon the rule or at least not extend it to inverse condemnation proceedings.

In urging abandonment of the exclusionary rule, respondent has anticipated *The County of Ramsey v. Miller,* 316 N.W.2d 917 (Minn. 1982), just recently decided, which decides the issue here. There we held, "in light of current practices in the real estate area, the use of computer technology and the approach to a more liberal introduction of evidence suggested by our new rules of evidence," that "specific prices of comparable sales may be used in both direct testimony of witnesses, as well as on cross-examination." (316 N.W.2d at 922). This evidence, of course, must meet the usual test of relevancy, *i.e.,* that the comparable sales be of pertinent

kinds of property and the sales should not be remote in terms of time.

The main objection to admitting comparable sales prices has been that it raises confusing and prejudicial collateral issues, but we think the difficulty is exaggerated. The relevancy requirement keeps the evidence manageable and pertinent, and, since the evidence has always been admissible through the back door on cross-examination, it surely should be admissible through the front door on direct examination. The evidence is plainly relevant; in this case, for example, evidence of comparable sales goes not only to diminution in value but whether aircraft noise is a cause of the diminution. Other possible causal factors must be identified and eliminated, and on these issues market studies, if they are to be meaningful, must include values of similar properties in areas without or with less aircraft noise. Petitioners say it is impossible to cross-examine as to "hundreds of comparables" as were used in the regression analysis, but we believe this kind of evidence can be effectively tested by questions which go to the suitability of the data base and the reliability of the techniques used.

We hold the trial court properly admitted evidence of comparable sales prices. Our cases to the contrary are overruled, therefore, in accordance with *The County of Ramsey v. Miller.*

■ 3. Petitioners next contend the trial court, on the issue of value diminution, misapplied *Alevizos I.* We disagree. They argue it is not their obligation to prove the exact amount of damage to the property in the mandamus trial, only "to show the airplane noise invasion results in a definite and measurable diminution of the market value of the property."

We do not disagree with this characterization of the diminution standard; indeed, this is the standard the trial court applied. Petitioners' problem is that they failed to carry their burden of proof to meet the standard.

In its memorandum the trial court said, "The *Alevizos* test, however, requires more than an intuitive decision by the court—diminution in value must be objectively proven by the petitioners." Petitioners argue this means the trial court ignored the "subjective" opinions of the appraisal experts. We do not think this is what the trial court was saying. The court was only observing that an opinion on diminution, to be persuasive to the trier of fact, should ordinarily be substantiated by some kind of market studies or other documentation. Mere assertions are not enough. This is particularly so where, as we said in *Alevizos I*, the subjective discomfort or inconvenience of the landowner does not, by itself, prove any loss in market value of the land.

■ In *Alevizos I*, we rejected a nuisance theory which would involve balancing an airport's utility against the resultant inconvenience to its neighbors. Instead, *Alevizos I* casts the landowner's remedy in terms of eminent domain, thereby depriving the airport of any right to a balancing test while at the same time denying the landowner recovery for interference with enjoyment of his property, unless and until "those interferences reach the point where they cause a measurable decrease in property market value." 298 Minn. at 486, 216 N.W.2d at 662. Until that point is reached, the landowner must endure the inconvenience suffered by the average member of a modern technological society.

Diminution in one's enjoyment and use of property is not the same as a diminution in market value; petitioners' error is in equating the two. An affront to one's sensibilities becomes legally cognizable here only when it becomes a servitude on the property itself, depressing its value on the market.

We reaffirm the diminution standard of *Alevizos I* and hold it was correctly applied here.

■ 4. We now reach the critical and dispositive issue on this appeal, petitioners' argument that they were deprived of a jury trial. Because we believe petitioners were misled by language in *Alevizos I* as to the jury's role, we conclude there must be a new trial.

When the case was first called for trial, petitioners not only did not request a jury but opposed MAC's request for one. Consequently, the trial court, on post-trial motions, held that petitioners had waived their right to any jury. Petitioners, however, point out that in *Alevizos I* we said that whether governmental action amounts to a taking "is a question of law to be determined *in the initial instance* by the trial court," 298 Minn. at 484, 216 N.W.2d at 660 (emphasis added). We then went on to say:

MAC will be entitled to a jury trial on fact questions in any case by appealing from the commissioner's award. *If the court determines any petitioner is not entitled to inverse condemnation, a jury trial shall be essential as to any fact questions.* Thus, as to both MAC and petitioners, the Thomsen mandate for a jury trial on fact issues in a mandamus action will be followed.

298 Minn. at 488–89, 216 N.W.2d at 663 (emphasis added). Petitioners say they took this language literally, *i.e.*, that they had a right to a further proceeding with a jury if the trial court decided initially that there was no taking.

This quoted language, however, must be understood in the context of "the Thomsen mandate for a jury trial." In *Thomsen v. State*, 284 Minn. 468, 170 N.W.2d 575 (1969), the issue was whether the construction of a four-lane highway within 10 feet of plaintiff's house would result in such annoyance and hazard as to damage plaintiff's property in a constitutional sense. After stating that the question of a constitutional taking was a question of law for the court to decide, we went on to say, "where the facts are disputed the mandamus court should utilize a jury to resolve the disputes preparatory to its decision on the ultimate question of law," citing Minn.Stat. § 586.12 (1980). We then remanded to the trial court, which had heard the case originally without a jury, to decide whether there had been a taking, but observed at the same time that the facts in that case were not in

dispute and therefore there was no reason for the trial court on remand to impanel a jury.

*Alevizos I* follows *Thomsen's* requirement of a jury trial to resolve mandamus fact issues. Thus the critical sentence in *Alevizos I*, which reads "if the court determines any petitioner is not entitled to inverse condemnation, a jury trial shall be essential as to any fact question," should be understood to mean that if the trial judge does not *as a matter of law* find a taking (as, for example, it could have in *Thomsen* where the facts were undisputed), then a jury resolves the disputed facts. After the jury has resolved the disputed facts, the judge then rules whether the facts as found by the jury legally constitute a taking.

■ *Alevizos I* presents a two-step test for a constitutional taking in these unique airport noise cases: namely, does the noise constitute a "substantial" invasion and does such invasion result in a "measurable" diminution of market value. While in the end these are questions of law, they are actually questions of law "mixed" with questions of fact. Whether noise of a specified decibel level constitutes a loss of practical enjoyment of property over and above the inconvenience suffered by the average city dweller is a legal question to be decided by the judge. How loud the noise is, however, is a fact question, and if the noise levels are in dispute, a jury must resolve this dispute. Similarly, whether a specific change in market value constitutes a "definite and measurable" change is a legal question, but what that diminution actually is and whether it is caused by airport noise are, again, fact issues. In this case, on the two critical issues of diminution and causation, the facts were in dispute and should have been presented to a jury impaneled for the mandamus trial, unless a jury was waived.[5]

■ We can appreciate, however, that our language in *Alevizos I* may have misled petitioners into believing that the trial

court would conduct the mandamus trial without a jury trial, and only if the trial court then found no taking would a jury be impaneled for a second hearing. Petitioners say that if they had understood otherwise, they would have tried their case differently and, of course, would not have initially refused a jury. Under these circumstances, we conclude there was no waiver and the fair thing to do is to grant a new trial.

As is evident from this case, a property owner has a difficult burden of proof. Moreover, in disputed cases, there may be two jury trials—initially at the mandamus hearing, and in some cases, on appeal of a commissioners' award to the district court. Each trier of fact, however, has its own function: the mandamus jury resolves general factual questions as part of the legal question of a constitutional taking; the commissioners set the exact dollar amount the particular owner has been harmed; and should the commissioners' award be appealed, the district court jury again sets the dollar award.

The other contentions raised by petitioners have been considered and deemed to be without merit. Petitioners point out that the trial court did not rule on the issues of laches and the statute of limitations. While these issues were litigated, at the close of trial respondent withdrew these defenses so they were not before the trial court for a ruling. Since this is a test case, petitioners urge us nevertheless to consider these issues, even though now moot and without the trial court's thinking. We are not unmindful, as we fill in the specifics of *Alevizos I*, that matters such as these may need clarification, but we decline to do so without the benefit of the full litigation process below.

We recognize that the inverse condemnation doctrine is not entirely congenial to resolving the problems facing property owners near an airport, but even less so are

---

5. At the mandamus trial, if a taking is found, the trial court will also have to describe the property interest taken, *i.e.*, the avigational easement, probably in terms of decibel levels and frequency. This, clearly, is a question of law for the court. *Cf. State v. Anderson*, 220 Minn. 139, 19 N.W.2d 70 (1945).

the doctrines of trespass and nuisance. Counsel at reargument were unable to suggest any other solution, and this approach, in our opinion, most fairly responds to the needs and conflicting interests of the parties and the public.

Reversed and remanded for a new trial on all issues.