**STATE of Minnesota, by Hubert H. HUMPHREY, III, Appellant,**

**v.**

**Donald O. STROM, et al., and Mildred L. Sponsel, et al., Parcel 40: Woodbridge Plaza, a Limited Partnership, Respondents.**

**Nos. C4–91–1941, C7–91–1870.**

Supreme Court of Minnesota.

Dec. 18, 1992.

Hubert H. Humphrey, III, Atty. Gen., Sherry A. Enzler, Sp. Asst. Atty. Gen., Donald Mueting, Asst. Atty. Gen., St. Paul, for appellant.

Richard J. Gunn, Bradley J. Gunn, Minneapolis, for respondent.

Carla Heyl, St. Paul, amicus curiae for League of Minnesota Cities.

WAHL, Justice.

The questions certified in this appeal ask us to determine whether evidence of construction-related interferences and loss of visibility may be taken into account to the extent they affect the market value of the

property in determining just compensation in an eminent domain proceeding. We answer both questions in the affirmative.

In October 1986, the State of Minnesota began eminent domain proceedings pursuant to Minn.Stat. § 117.042 (1986) to acquire property necessary for the construction and conversion of Highway 12 to a federal interstate highway, I–394. The condemnation included a partial taking from an office site owned by respondent Woodbridge Plaza, a Limited Partnership ("Woodbridge"), located on the south side of old Highway 12 in Minnetonka.

On December 31, 1986, the court granted the state's petition to acquire 13,700 square feet of Woodbridge's property in fee and 4,371 square feet as a four-year temporary construction easement and ordered the taking and the vesting of title in the state on February 4, 1987. All of the property acquired from Woodbridge was used for construction of the appurtenant frontage road system. Construction of this portion of the project began in April 1987 and was completed in July 1990.

Court-appointed commissioners filed an award of damages, based on evidence presented at hearings, in the amount of $707,-873 for the partial taking. Of this amount $114,688 is for the land taken, $593,185 is for damage to the remainder. Both parties appealed the award to the district court for a jury trial. The state claims the award is excessive and that the damages do not exceed $227,000. Woodbridge claims the award is inadequate, that damages exceed $3 million.

Prior to trial both parties moved for partial summary judgment to obtain expedited judicial review of whether construction-related interferences and loss of visibility may be taken into account to the extent they affect the market value of the property in determining just compensation. The district court granted Woodbridge's motion to allow the jury to consider evidence of both construction-related interferences and loss of visibility, not as separate items of damage, but to the extent they may bear on the market value of the property after the taking.

The state petitioned the court of appeals for discretionary review of the district court's order. In addition, the district court certified two questions concerning the admissibility of evidence of construction-related damages and damages involving loss of visibility as important and doubtful under Minn.R.Civ.App.P. 103.3(h). The court of appeals consolidated the appeals and granted discretionary review. This Court granted accelerated review pursuant to Minn.R.Civ.App.P. 118.

Woodbridge is the fee owner of what was originally a 3.75 acre tract abutting the frontage road that was part of the old Highway 12 right-of-way. The area is zoned for commercial or business use and the tract is improved by a three-story, well-maintained, quality office building. The building was built in 1981–1982, is of sound construction, and contains 36,035 square feet of net rentable area. The property is attractively landscaped and improved with a 180 space asphalt parking lot.

Old Highway 12 is one of the major routes connecting downtown Minneapolis with the western suburbs. It is being converted into a "limited access" highway designated as Interstate–394 (I–394). The full project involves the reconstruction of eleven miles of highway and the reconstruction and relocation of both the north and south frontage roads. The construction of the highway and the frontage roads are occurring simultaneously and are jointly funded by federal-state highway funding. The plan now calls for the frontage roads to be turned over to local units of government for operation and maintenance when construction is completed in June 1993.

The construction-related problems visited upon the Woodbridge property are typical of the problems being experienced by other commercial properties located along the length of the reconstruction. For instance, access to many of the commercial enterprises in the area has been seriously disrupted. The location of the access to the Woodbridge property changed many times during the period of construction. The route was often circuitous and inconvenient

although it was never completely eliminated.

During the construction period, the occupancy level of the building dropped dramatically, from 91.6% in 1987 to 56.7% in 1988. The occupancy rate remains low—65% in 1990. The net rental rate also dropped—from $10.59 per square foot in 1987 to $7.90 per square foot in 1988. The rental rate in 1990 was $4.48 per square foot. For the purpose of this pre-trial appeal, we assume that the construction-related interferences caused a temporary reduction in rental income.

In addition, the project has permanently impaired the view and visibility of much of the remaining property. Before construction, the Woodbridge property and its landscaped grounds were fully visible to passing motorists on old Highway 12. Old Highway 12 (I–394) has now been lowered two to six feet in front of the property while the south frontage road has been elevated nine to twenty-one feet. As a result, the visibility of the property to passing motorists on I–394 has been substantially reduced. However, visibility from the south frontage road has not been affected. For the purpose of this pre-trial appeal only, the parties agree and we assume that the reduction of visibility caused a reduction in the income stream generated by the use of the remaining property, that is also reflected in lower occupancy rates and rental income.

The two questions certified by the district court are these:

1. In a partial taking condemnation action, is evidence of construction-related interferences admissible, not as a separate item of damages, but as a factor to be considered by the finder of fact in determining the diminution in market value of the remaining property?

2. In a partial taking condemnation action, is evidence of loss of visibility to the public traveling on a redesigned highway admissible, not as a separate item of damages, but as a factor to be considered by the finder of fact in determining the diminution in market value of the remaining property.

■■■ The certified questions raise the issue of the extent to which the district court may limit evidence that may be considered by a jury in determining the fair market value of a remainder. When a taking of private property by the state occurs, both the state and the federal constitutions require that just compensation be paid.[1] Minn. Cons. art. 1, § 13 provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." This language is broader than the language of the federal constitution: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In addition, Minn.Stat. § 117.025, subd. 1 (1986) defines "taking and all words and phrases of like import" to include "every interference, under the right of eminent domain, with the possession, enjoyment, or value of private property." Thus, the clear intent of Minnesota law is to fully compensate its citizens for losses related to property rights incurred because of state actions.[2]

■■■ Minnesota has followed the "before and after" rule to determine the measure of just compensation for a partial taking. According to this rule, the measure of damages is the difference between the fair market value of the entire piece of property immediately before the taking and the fair market value of the remainder of the property after the taking.[3] *State v. Casey,*

---

1. "Just compensation" must be "a full and perfect equivalent for the property taken." *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893).

2. Minn.Stat. § 160.08, subd. 5 (1986), dealing with construction of controlled access highways for public use, requires compensation of owners for "any elimination of existing access, air,

view, light, or other compensable property rights."

3. Minnesota Jury Instruction Guide 589 accurately reflects the measure of damages for a partial taking:

> PARTIAL TAKING—DAMAGES FOR PART TAKEN AND SEVERANCE DAMAGES
> Just compensation to an owner when only part of a tract or property is taken is the

263 Minn. 47, 50, 115 N.W.2d 749, 752 (1962). *See also State v. Pahl*, 254 Minn. 349, 356, 95 N.W.2d 85, 90 (1959); *City of Chisago City v. Holt*, 360 N.W.2d 390, 392 (Minn.Ct.App.1985). "To determine the fair market value of property in a condemnation proceeding '[a]ny competent evidence may be considered if it legitimately bears upon the market value.' " *Ramsey County v. Miller*, 316 N.W.2d 917, 919 (Minn.1982) (quoting *State v. Malecker*, 265 Minn. 1, 5, 120 N.W.2d 36, 38 (1963)). *See Casey*, 263 Minn. at 51, 115 N.W.2d at 752.

■ To determine the value of property taken in an eminent domain proceeding, the general rule is that " '[s]ubject to the caveat that such proof must be competent, relevant and material, evidence of any matter with [sic] would influence a prospective purchaser and seller in fixing the price at which a sale of the property could be consummated may be considered.' " *City of St. Paul v. Rein Recreation, Inc.*, 298 N.W.2d 46, 50 (Minn.1980) (quoting 5 P. Nichols, The Law of Eminent Domain § 18.11 (3d ed. rev. 1979)).

■ In other words, evidence will be admitted concerning any factor which would affect the price a purchaser willing but not required to buy the property would pay an owner willing but not required to sell it, taking into consideration the highest and best use to which the property can be put. *Accord Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934) ("In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining."). *See also Victor Co. v. State*, 290 Minn. 40, 44, 186

N.W.2d 168, 172 (1971) (award "considered not as an independent item of loss but as an element of damage affecting the market value of the tract remaining."). To not admit such evidence causes factors ordinarily considered when negotiating a price for a particular piece of property to be excluded and would result in the determination of a fair market value not of the property at issue but of some nonexistent hypothetical piece of property. *See, e.g., State ex rel. State Highway Commission v. Nickerson*, 578 S.W.2d 916, 918 (Mo. 1979) (Jurors who were told "to value a hypothetical 2.11 acre tract with no change in traffic" were told "to value a tract which did not exist.").

■ However, separate factors may not be considered as specific items of loss. Thus, "depreciation of the fair market value operates as the limit of the owner's recovery." 4A Julius L. Sackman, Nichols, The Law of Eminent Domain § 14.07 (rev. 3d ed. 1989) [hereinafter Nichols]. In addition, evidence of "diminution in value of only *the real estate* is relevant." *Hendrickson v. State*, 267 Minn. 436, 447, 127 N.W.2d 165, 173 (1964) (emphasis added). Damages for lost profits, goodwill or income, for instance, are too speculative to be considered because these damages "depends not only on the location of access but on such complex and intangible variables as the initiative and industry of the proprietors." *Id.*

We address first the question of whether construction-related interferences may be considered by the jury to determine fair market value. The parties have stipulated that, as a result of the changes in access during construction and other factors at-

difference between the fair market value of the entire tract immediately before such taking and the fair market value of what is left after such taking. The result of this subtraction is the just compensation to which the owner is entitled for the part taken as well as for the severance damages to the part not taken.

[Give JIG 585 if not previously given.]
Jig 585 states:

FAIR MARKET VALUE

In determining the fair market value of the property at the time of the taking, you will consider all facts and circumstances which a buyer and seller in the open market would reasonably consider and which would bear upon the question of the value of the property. Fair market value is the price which the evidence discloses would be paid for the entire property by a buyer who is willing, but not required to buy, to an owner who is willing, but is not required to sell. An owner is entitled to the value of the property for which it may be most advantageously used.

tributable to construction, such as vibration, noise, and dust, the owner of the property suffered damages during the construction period in the nature of a temporary reduction of rental income which reduction was attributable to construction activities.

According to the state, these construction-related interferences are not compensable because they are temporary inconveniences which do not permanently diminish the value of the property; they are general damages which do not differ markedly from the damages suffered by the public at large as a result of the construction of the highways; and they constitute a personal and temporary deprivation to the owner, not damages to the owner's remaining property. Woodbridge argues that construction-related interferences are factors which a willing purchaser and a willing seller would be influenced by in fixing a price for the remainder of the property immediately after the taking.

▪ We have held that damages sustained "by reason of inconvenience affecting the use and enjoyment of the remainder may be considered by the jury not as an independent item of loss but as an element which affects the market value of the remaining area." *State v. Hayden Miller Co.*, 263 Minn. 29, 33, 116 N.W.2d 535, 538 (1962). *See also Underwood v. Town Board of Empire*, 217 Minn. 385, 389, 14 N.W.2d 459, 462 (1944) ("It is well settled that, where part of the owner's land is taken, resulting inconvenience affecting the use and the enjoyment of the remainder is proper for consideration as affecting the market value of the land after the taking.").

▪ Construction-related interferences are temporary and any impairment to value is also temporary. However, the "mere fact that injuries will be temporary and incident to the period of construction only is no ground for disallowing recovery, since a purchaser might pay less if he knew such injuries were to be inflicted." *Nichols, supra*, at § 14.08. *Accord Brakken v. Minneapolis & St. Louis R. Co.*, 29 Minn. 41, 45, 11 N.W. 124, 126 (1881) (temporary

damages allowed to the time of the commencement of the suit).

▪ Nor do we find these construction-related damages to be general damages. In *City of Crookston v. Erickson*, 244 Minn. 321, 325, 69 N.W.2d 909, 912–13 (1955), this court set out the rule that "in cases where there is a partial taking, the injured owner is not required to show that the injury is peculiar to his remaining property. It is sufficient that the damage is shown to have been caused by the taking of part of his property even though it is damage of a type suffered by the public as a whole." *See Underwood*, 217 Minn. at 390, 14 N.W.2d at 462 (decrease in market value "is the particular respect in which the deprivation causes damage for which compensation is allowed."). *See also* Nichols, *supra*, § 14.11 ("Where part of a tract has been taken for a highway or for a railroad, the inconvenience or discomfort resulting from construction and operation of such project is an element which may be considered in ascertaining the extent to which the market value of the remainder area has been depreciated.").

▪ The state argues, on a policy level, that to allow admission of evidence on construction-related interferences on the issue of market value would make highway projects prohibitively expensive. This is not a reason to under-compensate abutting landowners. Furthermore, we agree with the California court in *Volunteers of America* that: "Any consideration of [means of transportation other than by private automobile] is clouded if the true economic burden of providing freeways for motor vehicle travel is concealed by requiring adjacent owners to contribute more than their proper share to the public undertaking." *People v. Volunteers of America*, 21 Cal. App.3d 111, 128, 98 Cal.Rptr. 423, 435 (Cal. Ct.App.1971).

▪ We answer the first certified question in the affirmative: In a partial-taking condemnation action, evidence of construction-related interferences is admissible, not as a separate item of damages, but as a factor to be considered by the finder of fact

in determining the diminution in market value of the remaining property.

The second certified question asks whether, in a partial-condemnation action, evidence of loss of visibility to the public traveling on a redesigned highway is admissible, not as a separate item of damages but as a factor to be considered by the finder of fact in determining diminution in market value of the remaining property.

Both parties agree, in the stipulated facts, that the visibility of the subject property to passing motorists on the main traveled east and west bound lanes of T.H. 12/I–394 has been significantly reduced with the construction of I–394, though visibility from the south frontage road has not been significantly affected. Both parties agree, for the purposes of the partial summary judgment only, that the reduction of visibility from the main-traveled lanes of east and west bound T.H. 12/I–394 has resulted in a reduction in the income stream generated by the use of the remaining property which may be reflected in occupancy rates and rental income for the subject property.

■■■ The question of whether loss of visibility is ever compensable in an eminent domain proceeding in Minnesota is an issue of first impression. The value of any commercial property is dependant in part on its location and sometimes on its visibility:

> "Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real property. Concededly such advantages are not absolute rights, but to the extent that the reasonable expectation of their continuance is destroyed by the construction placed upon the part taken, the owner suffers damages for which compensation must be paid."

*Volunteers of America*, 21 Cal.App.3d at 122, 98 Cal.Rptr. at 431 (quoting *Pierpont Inn, Inc. v. California*, 70 Cal.2d 282, 74 Cal.Rptr. 521, 530, 449 P.2d 737, 746 (1969)).

Most jurisdictions that have considered the question of whether evidence of loss of visibility from a public roadway is admissible to show a diminution of market value have concluded that it is admissible in certain instances. The reasoning we find most persuasive is that of the Alaska Supreme Court in *8,960 Square Feet v. Dept. of Transp.*, 806 P.2d 843 (Alaska 1991). There the court reasoned that, although a property owner "has no right to an unobstructed line of vision to his property from anywhere off of his property, absent an easement of some sort, [the] ownership of land abutting on a road gives the owner the right to control the visibility of all adjoining land further off the road." *Id.* at 846. Therefore, when loss of visibility is caused by changes made on the parcel taken by the state, the state must pay extra for this important commercial asset. *Id.* The court concluded "the best position is that loss of visibility is compensable in an eminent domain proceeding where the diminished visibility results from changes on the property taken from the landowner." *Id.* at 848.

We consider this rule most compatible with the compensation provision of our state constitution. Therefore, although the owner of property abutting a highway may, as the state points out, have no compensable property right to the continuous and sustained flow of traffic past its property, *Recke v. State*, 298 Minn. 500, 502–503, 215 N.W.2d 786, 788 (1974), where, as here, the property taken by the state from the abutting owner was used to raise the south frontage road to 21 feet and obstruct visibility from I–394 to the remaining property, evidence of that loss of visibility may be taken into account when determining the fair market value of the remaining property.

We answer the second certified question in the affirmative, as modified. In a partial-taking condemnation action, to the extent that loss of visibility to the public traveling on a redesigned highway results from changes in the property taken from the owner, evidence of that loss is admissible, not as a separate item of damages, but as a factor to be considered by the finder

of fact in determining the diminution in market value of the remaining property.

Certified questions answered.

SIMONETT, Justice (dissenting in part and concurring in part).

I would answer the first question "no" and the second question "yes," and, therefore, respectfully dissent in part.

In a partial taking the condemnation award breaks down into (1) damages for the part taken and (2) severance damages to the part remaining. Severance damages can occur because: (a) the part remaining is a smaller, less usable tract; and (b) the part remaining is adversely affected because of the way in which the land taken from the owner and others is put to use by the taker. This second type of severance damages is also called "consequential" damages.

Consequential damages include such adverse consequences as decreased accessibility, aesthetic blight or loss, fumes, noise, and traffic inconveniences. Not all adverse consequences translate into severance damages. Some interferences with the owner's use and enjoyment of the remaining tract are to be borne by the owner because common to the public generally and part of the cost of living in "a vibrant and progressive society." *Alevizos v. Metropolitan Airports Comm'n,* 298 Minn. 471, 486, 216 N.W.2d 651, 662 (1974). The dividing line is not always easy to determine.

When no property has been taken, consequential damages are not recoverable unless the consequential injury is peculiar to the adjoining property. *City of Crookston v. Erickson,* 244 Minn. 321, 325, 69 N.W.2d 909, 912 (1955). It does not necessarily follow, however, that if there is a partial taking all adverse consequences are compensable. Because part of a tract has been taken does not always mean the owner of the remainder suffers any more or different inconveniences than his adjoining neighbors who have not had any part of their land taken. Indeed, in *City of Crookston,* we said that the remainder owner ordinarily cannot recover consequential damages "caused * * * by the taker's use of property acquired from adjoining landowners even though his and all property taken from others is used to further the same project." *Id.,* 244 Minn. at 325, 69 N.W.2d at 913.[1]

Two of our cases are especially instructive on the test for consequential damages. In *City of Crookston v. Erickson, supra,* mentioned above, land was taken from three owners for the construction of a sewage disposal plant. Parcel A was taken in its entirety and need not concern us. With respect to both Parcels B and C there was a partial taking. About 6 acres were taken from Parcel B's 15 acres to be used as part of the sewage disposal site but with no structures to be built on the part taken. On Parcel C, the city took a 33–foot strip for its underground sewer line. This court held that the owner of the Parcel B remainder might recover consequential severance damages for any decrease in market value caused by its undesirable proximity to the sewage disposal plant. The court also held, however, that the owner of the Parcel C remainder could not recover on a similar claim of consequential damages. The test, we said, was whether the part taken constitutes "an integral and inseparable part of a single use to which the land taken and other adjoining land is put." *Id.,* 244 Minn. at 327, 69 N.W.2d at 914 (citing *Andrews v. Cox,* 129 Conn. 475, 482, 29 A.2d 587, 590). We said the factfinder could find Parcel B met the test but, as a matter of law, that the Parcel C remainder did not. Implicit in this ruling was a determination that any

---

1. "It would appear that the position taken by the courts [to allow consequential damages whenever there is a partial taking] does not withstand examination and breaks down into an arbitrary thesis both in theory and in application. Theoretically * * * the adjacent landowner who suffered loss by way of consequential damages should be reimbursed without regard to whether the sovereign took any land from him directly. Or, stated otherwise, a landowner should not be awarded consequential damages because a portion, however small, of his land was taken, where his neighbor, suffering the same loss, receives none because no portion of his land was actually taken." Annotation, *Eminent Domain—Use of Adjoining Land,* 59 A.L.R.3d 488, 492–93 (1974) (citations omitted).

injury to Parcel C was not sufficiently direct and substantial.

The second case is *Thomsen v. State*, 284 Minn. 468, 170 N.W.2d 575 (1969). In *Thomsen* no part of the landowner's property was taken. There was no partial taking. Instead, the state built a highway on a right-of-way that it had long owned, but because the adjoining landowner had improvidently previously built his house within 10 feet of the right-of-way, the landowner was, to put it mildly, seriously inconvenienced. We said under these unusual facts the trial court on remand might find that the landowner had sustained damages "in a constitutional sense." The test, we said, was whether the public improvement had "unfairly, directly, substantially, and peculiarly injured" the adjoining landowner's property. *Id.*, 284 Minn. at 474, 170 N.W.2d at 580. *See also Wolfram v. State*, 246 Minn. 264, 74 N.W.2d 510 (1956) (claim for traffic inconvenience from nearby "cloverleaf" denied, not because there was no taking but because there was no "special" damage).

Whether or not there has been a taking of land, I believe the test for when consequential adverse interference may be considered by the factfinder is whether the interference unfairly, directly, substantially, and peculiarly causes a diminution in the market value of the landowner's property. If there has been a partial taking, that is important. The significance of a partial taking is that it may establish, in a way that a non-taking cannot, the kind of close proximity between the remainder tract and the operation of the public improvement which is necessary to establish that any injury is, indeed, direct, substantial and peculiar.

I would treat the foregoing test for allowing consideration of adverse consequences as a question of law for the trial court. *Cf. Hendrickson v. State*, 267 Minn. 436, 445–46, 127 N.W.2d 165, 167 n. 19 (1964) (trial court ordinarily should decide "as a matter of law" if there has been damage). Whether there has been an unfair, direct, substantial, and peculiar injury determines if there has been damage in a

constitutional sense. This determination relies, of course, on facts; but where undisputed facts themselves become part of the contours of the constitutional right as applied, it is for the court to make this determination. *Watts v. Indiana*, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (1949); *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 659, 65 S.Ct. 870, 874, 89 L.Ed. 1252 (1945).

I.

Here the south-side frontage road abutting Woodbridge was at various times closed and torn up, so that access was often circuitous and inconvenient. In addition, Woodbridge was subject to construction noise, vibration, dust, aesthetic loss and other inconveniences. These problems continued for about 3½ years.

In my opinion these interferences were direct and substantial. These construction-related activities were not, however, peculiar to Woodbridge. Nor were they different in kind to the inconveniences experienced by others owning property in close proximity to the highway construction. While the degree of inconvenience may have varied, it cannot be said the inconveniences differed in kind from those experienced generally by property owners in the area, including those whose property was not taken.

Moreover, although these interferences may have a substantial impact, that impact is temporary. The question, then, is how long must construction activities continue and in what particulars before they become relevant to market value diminution? Even in the case before us, where 3½ years is a substantial period of time, it is difficult to fit this factor into the before-and-after rule. The construction activity occurs after the taking. While a willing buyer at the time of taking would wish to discount the selling price for the reduced occupancy of the office building during construction yet to occur, the seller would likely counter with the expected enhanced value of the property after the new highway was completed. Yet if this were done, the net result both becomes speculative and runs

counter to the rule that general benefits of the highway are not to be considered.

Finally, implicit in the test for compensable consequential damages is the concern for a reasonable containment of land acquisition costs for public improvements. To allow condemnation awards which reflect temporary fluctuations in the market value of the remainder tract for construction inconveniences distorts and unduly inflates eminent domain parameters. If relief to landowners for construction-related inconveniences is to be allowed, it should be done by separate legislation. *Compare* Uniform Relocation Assistance and Real Property Acquisitions Policies Act, 42 U.S.C. 4601 *et seq.* and Minn.Stat. § 117.52 (1990) (relocation expense paid even though not a damage cognizable under eminent domain).

## II.

This brings me to the second certified question. Prior to the new construction, it appears that the Woodbridge property, the frontage road, and Highway 12 were pretty much all on the same grade. The new construction includes a new frontage road partly on the land taken from Woodbridge, with the grade raised from 9 to 21 feet. In addition, the grade of old Highway 12 in front of Woodbridge has been lowered some 2 to 6 feet. As a result, east- and west-bound motorists on new Highway I–394 are some 11 to 27 feet below the grade for the office building. As they pass the Woodbridge site, their view of the office building is significantly reduced. This is a permanent interference.

Woodbridge claims it has an easement of view to be seen from the highway, but does not claim interference with this view is a separate item of damages, only a factor to be considered in determining diminution in value of the remainder tract. Woodbridge also cites our cases holding that a change in grade of an existing highway is compensable. *See, e.g., Sallden v. City of Little Falls*, 102 Minn. 358, 113 N.W. 884 (1907). The state, in turn, contends there is no such thing as an easement of view to be seen from the highway, only an easement of view looking out from the abutting property to the highway. The state also argues that damages for change of grade is a common law claim, not a constitutional taking, apparently having in mind the somewhat equivocal language in cases such as *Electric Short Line Terminal Co. v. City of Minneapolis*, 242 Minn. 1, 64 N.W.2d 149 (1954). Both parties cite cases from other jurisdictions in support of their positions.

Whether there is an implied easement of view *to* the abutting landowner's property, as well as *from*, is an interesting question. But, as sometimes happens in a case on appeal, to say a question is interesting does not mean it has to be answered. This case is more properly analyzed as a case of consequential damages. In this context, the question is not whether there has been the taking of a property interest, an appurtenant easement of view, but whether the state's use of the land taken (both that of Woodbridge and of others) has caused an unfair, direct, substantial and peculiar injury to Woodbridge's remainder real estate. I agree with the majority's opinion that it has.

It appears visibility of the office building from the highway is an important marketable attribute of the Woodbridge remainder tract, and the parties agree for the purpose of this appeal that visibility has been significantly reduced. It can also be said that this interference peculiarly injures the property and does so unfairly, in the sense Woodbridge is asked to shoulder a burden others do not.

The reason the new frontage road rises 9 to 21 feet in front of the Woodbridge property is because the road at this point must rise to join the nearby Shelard Parkway overpass. This, to me, is significant. The new frontage road is not similarly raised in front of all other property abutting the road. Thus the raised road embankment is peculiar to the Woodbridge property. This unique circumstance, coupled with the fact that the embankment is partially on land taken from Woodbridge, leads me to conclude that loss of visibility here is a factor

to be considered in determining severance damages.

I am not so sure that the lowering of the grade of Highway 12, which affects only the center part of the right-of-way for the new highway system, should, by itself, be a factor bearing on loss of visibility as affecting the market value of the Woodbridge remainder tract. At times, visibility must yield to proper street improvements. *Cf. Haeussler v. Braun*, 314 N.W.2d 4, 8 (Minn.1981). In this case, however, the lowering of the highway and the raising of the frontage road (together with the retaining walls installed) combine as an "integral and inseparable" part of the highway improvement which takes place next to Woodbridge, so that all these highway features may be considered an interference contributing to loss of visibility as a consequential damage.

COYNE, Justice (dissenting in part and concurring in part).

I join in Justice Simonett's dissent in part and concurrence in part.

TOMLJANOVICH, Justice (dissenting).

I join Justice Simonett's dissent as to the first certified question, whether, in a partial taking condemnation action, evidence of construction related interferences are admissible, not as a separate item of damages, but as a factor to be considered by the finder of fact in determining the diminution in market value of the remaining property.

However, I would also answer no to the second certified question, whether, in a partial taking condemnation action, the evidence of loss of visibility to the public traveling on a redesigned highway is admissible, not as a separate item of damages, but as a factor to be considered by the finder of fact in determining the diminution in market value of the remaining property. Therefore, I respectfully dissent.

In determining condemnation awards, any fact may properly be considered, as long as it *legitimately* bears on the market value of the property. *State v. Gannons*

*Inc.*, 275 Minn. 14, 18, 145 N.W.2d 321, 326 (1966) (emphasis added). However, not all factors that affect market value are appropriate to consider. *See, Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939). Admission of evidence for non-compensable damages can give rise to an inference that those claims are compensable. *See, Minneapolis–St. Paul Sanitary Dist. v. Fitzpatrick*, 201 Minn. 442, 453, 277 N.W. 394, 400 (1937) (overturned by *Alevizos v. Metropolitan Airports Comm'n*, 317 N.W.2d 352, 358 (Minn.1982) (*Alevizos II*), to the extent that sale prices of comparable properties are now admissible).

Not every decrease in the value of property caused by public improvements is compensable; the damage must be to the property itself. *McCarthy v. City of Minneapolis*, 203 Minn. 427, 431, 281 N.W. 759, 761 (1938). The property must be damaged in substance rather than aesthetically. *Id.* Here, the road grade change has altered the ability of the motorists to see the Woodbridge building and landscaped grounds, which is an aesthetic, not substantive change in value.

The State may relocate a roadway, as it did here, "without being liable for consequential economic losses" sustained by adjacent property owners. *Recke v. State*, 298 Minn. 500, 503, 215 N.W.2d 786, 788 (Minn.1974). The property owner has no vested right in the traffic flow. *Id.* at 504 n. 1, 215 N.W.2d at 788 n. 1, citing *Mattson v. Colon*, 292 Minn. 189, 198, 194 N.W.2d 574, 579 (1972). Since there is no right to a continued flow of traffic past the owner's business property, it follows that there is also no right to be viewed by the traveling public. *See, Recke*, 298 Minn. at 504, 215 N.W.2d at 788.

Minnesota has never held that a property owner has a right to be seen, as distinguished from the "easement of view" permitting an owner to view outward from the property. *McCarthy v. City of Minneapolis*, 203 Minn. at 430–31, 281 N.W. at 761. An owner "cannot object * * * that a view of his shop windows or signs by the public is so cut off." *Id.* (Citation omitted).

Even if the right to be seen were synonymous with the implied right to a view, it is not an absolute right but an entitlement to a "view that [is] not obstructed by a proper street use." *Haeussler v. Braun*, 314 N.W.2d 4, 8 (Minn.1981) (emphasis added). Although the ability of the traveling public to see Woodbridge has been altered by the grade level change and construction, there is no dispute that the use of trunk highway 12 as converted to limited access 394 is a proper street use. Therefore, even if an adjacent property did have an entitlement to be seen, it must yield to the general public's right to travel on an improved street. *Id.* at 7–8. If this were not so, every property owner behind a sound barrier would have a cause of action to recover for the possible change in market value of their property since they could no longer see or be seen from the roadway. Perhaps even the junkyard operator who is required to provide screening would have a cause of action. *Haeussler* specifically rejects this notion.

Woodbridge has a right to be compensated for the partial taking. However, there is no inherent property right to be seen that is compensable, and therefore evidence of that loss should not be admissible. Woodbridge should not be in a better complaining position over the inconvenience and sight lines than other property owners surrounding the highway who have not had property taken. *See, Kentucky v. Ray*, 392 S.W.2d 665, 668 (Ky.Ct.App.1965).

The majority decision is a revolutionary and dramatic change in condemnation law. It results in a burden on the taxpayers that is unfair and unwise.

I dissent.