James J. SCHUMACHER, Arnold J. Feinberg, Robert H. Schumacher, and Ron McDaniels, Respondents,

v.

CITY OF EXCELSIOR, Minnesota, Appellant.

No. C8-87-1890.

Supreme Court of Minnesota.

Aug. 12, 1988.

Thomas J. Barrett, Thomas J. Radio, Minneapolis, for appellant.

Frank R. Berman, Scott G. Harris, Minneapolis, for respondents.

## OPINION

SIMONETT, Justice.

The trial court found that the city's reconstruction of one of its streets conferred no special benefit on the subject property, and that the special city assessment against the property was, therefore, void. We reverse and remand.

Third Avenue in the City of Excelsior runs in front of the Christmas Lake Apartments, a building complex owned by respondent property owners. In the summer of 1984, the city council approved a plan submitted by its engineers which, on Third Avenue, called for installation of concrete curbs and gutters, a new 8-inch water main, repairs of the sanitary sewer, a storm sewer system, and a new bituminous road surface. At the time, Third Avenue had no curbs or gutters. It did have a bituminous surface. There was a 6-inch water main and a sanitary sewer, but no storm sewer. Surface waters simply flowed along or across the avenue to low areas. At the public hearing held September 23, 1984, respondent owners filed their objections to the proposed assessment. The total cost of the improvements was $514,061.89, of which about 73 percent was assessed against property owners, the balance being paid by the city from various municipal funds. The four parcels comprising the Christmas Lake Apartments were assessed $66,711.62.

The owners appealed to the district court and, at trial, the parties agreed the issue was "the amount of the assessment and whether it reflected an increase in fair market value." The property owners' expert made no formal appraisal of the apartment complex. He felt it was not necessary to determine before-and-after market value because the only question was whether the improvements increased the property's market value, whatever it might be. Relying primarily on an income approach, the expert concluded that the assessment of $66,712.62 would be an additional expense of operation not recoverable by increased apartment rentals. He felt the improvements not only did not increase market value but reduced it. One of the owners gave much the same testimony. The city's expert, on the other hand, did an elaborate before-and-after appraisal, utilizing the three traditional approaches, namely, replacement value, comparable sales, and income. He concluded that the before-value was $2,060,000, and that after the improvements the market value was $2,185,000, an increase of $125,000.

The trial court accepted the testimony of the owners' witnesses and found that "the reasonable market value of each of the real estate parcels assessed was the same after the completion of the project * * * [as] prior to the completion of said project." Hence the trial judge held that the property had received no special benefit and the assessment was void. The city appealed to the court of appeals, which requested certification to this court. We accepted certification. Broadly stated, the issue is whether the evidence sustains the trial court's findings and conclusion of no special benefit.

■ "The cost of any improvement, or any part thereof, may be assessed upon property benefited by the improvement, based upon the benefits received * * *." Minn.Stat. § 429.051 (1986). To determine

the value of a special benefit, the taxing authority must consider what increase, if any, there has been in the fair market value of the benefited land. *Carlson–Lang Realty Co. v. City of Windom,* 307 Minn. 368, 369, 240 N.W.2d 517, 519 (1976). A special assessment that exceeds the benefit to the property, as measured by the difference in market value before and after the improvements, is a taking of property without fair compensation in violation of the fourteenth amendment. *Buettner v. City of St. Cloud,* 277 N.W.2d 199, 202 (1979). The increase in market value is calculated by determining what a willing buyer, under ordinary circumstances, would pay a willing seller for the property before, and then after, the improvement has been made. *Carlson–Lang Realty,* 307 Minn. at 369–70, 240 N.W.2d at 519; *Dosedel v. City of Ham Lake,* 414 N.W.2d 751, 756 (Minn.App.1987).

This case involves only the factual issue of whether the improvements increased the market value of the property. Because an assessment which would exceed the increase in market value would be an unconstitutional taking of the owners' property without fair compensation, the trial court makes an independent review of the evidence. *Buettner,* 277 N.W.2d at 203. Our appellate review consists of "a careful examination of the record to ascertain whether the evidence as a whole fairly supports the findings of the district court and whether these in turn support its conclusions of law and judgment." *Carlson–Lang Realty,* 307 Minn. at 373, 240 N.W.2d at 521.

Our careful examination of the record persuades us that the evidence as a whole does not support the trial judge's findings that the improvements resulted in no increase in market value to the apartment complex. The record fairly reflects that some appreciable increase did occur.

Here the city's appraiser gave several reasons for his opinion of an increase in market value, namely: (1) the swimming pool previously had drained into the street, but now it would drain into the new storm sewer; (2) the new water main would increase the water flow, resulting in a reduction in fire insurance premiums; (3) the repairs to the sanitary sewer would prevent tenant losses caused by the sewers "backing up"; (4) the street would have better drainage, be easier to plow, and would be safer; and, finally, (5) the new curbs and gutters, together with the improved street surface, enhanced the aesthetic appeal of the neighborhood. All but the last two of these reasons were discredited on cross-examination. First of all, it was shown that draining the swimming pool once a year into the street caused no environmental concerns, had been authorized by the city, and there was no indication that the authorities would not have permitted the practice to continue. *See Carlson–Lang Realty,* 307 Minn. at 372, 240 N.W.2d at 520–21 (the slight possibility that the city might close down the owners' private sewer and water system, especially in the absence of any evidence that this might happen, would make little difference to a willing buyer of the property). Second, the expert's assumption that the property owners' fire insurance premiums would be reduced was not only speculative but was disproved by other testimony that the new, larger water main would not bring the gallon-per-minute capacity of the system up to even half the capacity recommended by the insurance industry. Third, the expert's assumption that the sanitary sewer repairs were a benefit overlooked the fact that the cost of this improvement was paid for by the city and was not included in the assessments.

The major reason, however, given by the city for an increase in market value was the new, improved street. "[T]he property has much better street presence in the after situation versus the before," testified the city's appraiser, adding, "The road is cleaned up, and as a result it looks neater and will command a better rental." The appraiser also testified that the old street, with its broken surface, "posed somewhat of a hazard to drivers and * * * pedestrians." The trial judge rejected this testimony. He reasoned that the apartment complex received no assessable benefit because the property already had the benefit of a

hard-surfaced road, and, even though the city might be able to reduce its costs of maintenance and repairs because of the new road, this did not change the beneficial service available to the users of the property. We believe this reasoning is flawed. It is based, first of all, on a factual premise not supported by the record, and, second, it takes too narrow a view of the nature of a benefit.

The trial court assumed that Third Avenue was a good bituminous surfaced road prior to the improvements. The city's public works director testified, however, that there were many complaints about the poor surface of Third Avenue; that years of patching and seal-coating had been ineffective to stop potholes and break-up at all seasons of the year; and that the street had very little crown so that surface waters would collect on and at the edges of the street, resulting in break-up of the asphalt. Further, it appeared that the street in front of the apartments had been opened and patched many times for the installation of service lines into the complex. This evidence was never effectively rebutted.

The property owners' expert had not seen Third Avenue prior to its improvement. He was asked to assume the street had previously been in the same condition as that part of Third Avenue which extends further east into the City of Shorewood. Apparently, the Shorewood extension has not been improved by that city and yet was in good condition. But Excelsior's public works director explained that the Shorewood situation was different. His explanation and his description of the prior poor condition of the Excelsior section of the street was never really disputed. Hence no credible evidentiary support exists for the implicit finding of the trial court that Third Avenue did not need a new surface. On cross-examination, the property owners' expert conceded that if the street surface was pock-marked and breaking up, this would have a negative effect on the "appeal" of the apartment complex. As for the curbs, the trial court said many persons, particularly in a suburban setting, might prefer no curbs to curbs; but the converse may also be true, and the city council, after a public

hearing, chose curbs and gutters. With the installation of curbs and gutters, catch basins and a storm sewer were also necessary to dispose of the water.

Significantly, both the appraiser for the city and the appraiser for the property owners agreed that the new street was an improvement and a benefit. The property owners' expert also conceded on cross-examination that people are willing to pay more "for a building that looks nice, that the approach to the property is attractive." Usually, if property receives better municipal services and amenities, it is worth more. It is on the basis of this common experience that the law confers prima facie validity to a city's determination of assessable benefit. *Buettner*, 277 N.W.2d at 204. Here the owners' expert felt that the benefit of the new street did not increase the market value of the property because rents could not be raised. The expert's opinion that rents could not be raised was based, however, as he himself testified, on his assumption that the old street had not been plagued with potholes and cracking, an assumption that proved to be without support in the record. Interestingly, the trial court found that the before-and-after market values were the same, apparently not crediting the expert's opinion that the market value of the property actually dropped $97,000. While there is a high correlation between the rental market and the real estate market, some caution must be used because perspectives as to long-term capital improvements may subtly differ between a tenant renting an apartment unit and a buyer purchasing an apartment building.

We think, too, the trial court may have taken too narrow a view of what constitutes a benefit. Simply because the street had a bituminous surface prior to the new bituminous surface does not necessarily disqualify the improvement as an assessable benefit. If this were not so, a city would almost never be able to assess for updating or enhancing an existing municipal infrastructure. To determine whether or not there is an assessable benefit, the actual condition and quality of the street

before and after the improvement must be taken into account.

In this case, we conclude that the trial court's finding of *zero* assessable benefit is not supported by the evidence and is clearly erroneous. The owners introduced evidence that in part rebutted the city's prima facie case and the supporting testimony of its appraiser. The evidence as a whole, however, indicates that at least the improvements to the street created an increase in market value to the apartment complex. Whether the assessment exceeds what this market value increase might be, and, if so, by what amount, remains to be determined in further proceedings before the trial court. We reverse and remand for this determination. If the assessment exceeds the market value increase, the trial court remands to the city council for reassessment after first determining the "[constitutionally] permissible assessment ceiling." *Buettner*, 277 N.W.2d at 205.

Reversed and remanded.

POPOVICH, Justice (dissenting).

While I agree with the majority's statement of legal principles governing special assessments, I think the majority decides a factual issue that is properly left to the trial court. Both the trial court and the majority opinion describe the question in this case as purely factual: whether or not the improvements increased the property's market value. The trial court, relying largely on expert testimony offered by both the city and the property owners, found no increase in value. The court specifically found the owners' expert "far more credible."

It is true that in assessment cases we conduct a careful examination of the record to determine whether the evidence as a whole supports the trial court's findings. *Carlson–Lang Realty Co. v. City of Windom*, 307 Minn. 368, 373, 240 N.W.2d 517, 521 (1976). But it is not our role to disturb findings of fact simply because we would draw different conclusions than the trial judge. Findings of fact should not be set aside on review unless they are clearly erroneous. Minn.R.Civ.P. 52.01. We followed this basic rule in *Hartle v. City of Glencoe*, 303 Minn. 262, 226 N.W.2d 914 (1975), where the trial court found an increase in fair market value after property was connected to city water and sewer. There was conflicting testimony on that question, we noted, "but it is up to the finder of fact to resolve this conflict." 303 Minn. at 267, 226 N.W.2d at 918.

The trial judge here similarly resolved conflicting testimony, and evidence in the record supports his conclusion. The majority's analysis may be convincing, but it is often possible to reevaluate a trial court record and construct an alternative reading of the facts. In my view, we should not substitute our judgment on such a factual determination. For that reason, I respectfully dissent.

AMDAHL, Chief Justice, dissenting.
I join the dissent of Justice Popovich.

KELLEY, Justice, dissenting.
I join the dissent of Justice Popovich.