**EAGLE CREEK TOWNHOMES, LLP, Respondent,**

v.

**CITY OF SHAKOPEE, Appellant.**

No. C4–99–2010.

Court of Appeals of Minnesota.

July 18, 2000.

Review Denied Sept. 13, 2000.

Phillip R. Krass, Terrance J. Wagener, Krass Monroe, P.A., Bloomington, for respondent.

James J. Thomson, Jr., Kennedy & Graven, Chartered, Minneapolis, for appellant.

Considered and decided by
SHUMAKER, Presiding Judge,
HUSPENI, Judge * and PORITSKY,
Judge.

## OPINION

PORITSKY, Judge.**

Appellant City of Shakopee challenges both respondent property-owner Eagle Creek's standing to appeal a special assessment and a district court order reducing the special assessment levied against Eagle Creek's property. Because we conclude that Eagle Creek has standing and that the reduction of the special assessment was not based on an erroneous interpretation of the law, we affirm.

## FACTS

In 1994, appellant City of Shakopee (the city) approved project 1994–10 for public improvements, including streets, sewer, water, and other utilities, to property then owned by PACT Credit River Road LLP (PACT). In September 1997, the city approved a conditional use permit (CUP) for James Development to build a 96–unit apartment complex on the property, which had been zoned R–3 (multi-family residential). In October 1997, project 1994–10 was completed; in November 1997, the city levied a $388,730 special assessment against the property for the improvements. PACT paid, but appealed the assessment.

In April 1998, PACT entered into a purchase agreement with J.F. Johnson General Development Corporation (Johnson Development). The purchase agreement provided that

> [Johnson Development] shall pay all assessments whether levied or pending as of the Closing Date, as well as the installments of special assessments for the year of closing. For purposes of this Agreement, a "pending" special assessment means any work or project which, as of the Date of Closing, has been directed or authorized by any governmental authority, the cost of which will be, but has not yet been certified to and included in the real property taxes payable with respect to the Property, and specifically includes, without limitation thereto, the assessment in the amount of $ unknown.
>
> * * * *
>
> This Agreement shall inure to the benefit of, and be binding upon, the administrators, successors and assigns of the parties hereto.

In June 1998, PACT's attorney wrote to the city:

> PACT Inc. has entered into negotiations with [Johnson Development] regarding the purchase of [the] property. My

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

** Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

client has advised me that *should said purchase proceed*, [Johnson Development] does not wish to proceed with the special assessment appeal.

The purpose of this letter is to inform all parties *that upon closing of this sale*, PACT Inc. agrees to dismiss, with prejudice, its assessment appeal with regard to all land it sells to [Johnson Development], its successors or assigns. PACT Inc. further agrees to take such other and further actions as may be reasonably necessary to effectuate that assessment appeal dismissal.

(Emphasis added.) But PACT never transferred legal title of the property to Johnson Development; the sale never closed.

In July 1998, PACT did sell the property. It transferred its rights and interest in the assessment appeal to The Stuart Corporation (Stuart) and moved to substitute Stuart in the assessment appeal. The city opposed the motion, arguing that it was a third-party beneficiary to Johnson Development's agreement with PACT to dismiss the special-assessment appeal. The district court granted PACT's motion and substituted Stuart.

Stuart then sold the property to respondent Eagle Creek Townhomes, LLP (Eagle Creek), to whom Stuart transferred its rights and interest in the assessment appeal. Stuart successfully moved the district court to substitute Eagle Creek in the assessment appeal, although the city again opposed the motion, alleging third-party-beneficiary status. The city now challenges Eagle Creek's standing on this ground.

In August 1998, construction began on Eagle Creek Townhomes. Eagle Creek's expert, Robert Strachota, testified at trial that he appraised the property before and after the improvement by using the "discounted cashflow model." He described the model as measuring

> the present value of the Eagle Creek project as the combined value of the raw land and the return on the development as of August 1998. The project value quantifies what a buyer/investor would pay the developer in August 1998 assuming that the developer would be reimbursed for his out-of-pocket acquisition of the raw land, arranging for the timely construction of the project, and delivering the finished product to the buyer at a later date. The buyer purchases the right to receive the finished project and then assumes all debt (permanent financing) and remaining equity requirements of Eagle Creek once completed.

\* \* \* \*

> Therefore, after careful consideration of the many factors influencing [market] value, it is our opinion that the Eagle Creek Townhomes project has a market value (combined land value and present value of development profit), before and after Project 1994–10, as of August 1998, of:

| | |
|---|---|
| Value Before Project 1994–10: | $1,280,000 |
| Value After Project 1994–10: | $1,040,000 |
| Estimated Increase (Decrease) in Value: | ($240,000) |
| Indicated Net Benefit to Subject: | ($240,000) |

> Based on the values of the Eagle Creek project before and after Project 1994–10, we conclude there is no special benefit flowing to the subject property from Project 1994–10. In fact, the value of Eagle Creek actually decreases by $240,000 in comparison to what could have been achieved by developing it independently of Project 1994–10.

Strachota concluded, however, that "[t]here [had been] a net benefit to the development as a result of the public improvement project of $85,735" because the project "reduced the costs of development."

The district court, in accord with Strachota's appraisal, found that the improvements had increased the value of the property by $85,735, declared the original $388,730 assessment invalid, and ordered the city to refund the difference, with interest, to Eagle Creek. The city moved

for a new trial and amended findings. The motion was denied and this appeal followed.

## ISSUES

1. Did Eagle Creek have standing to pursue the special-assessment appeal?

2. Did the district court err by admitting Eagle Creeks appraisal?

## ANALYSIS

### 1. Eagle Creek's Standing

Where the facts are undisputed, standing is a legal question, which is reviewed de novo on appeal. *Joel v. Wellman*, 551 N.W.2d 729, 730 (Minn.App. 1996), *review denied* (Minn. Oct. 29, 1996). The facts here are not disputed.

The city argues that Eagle Creek lacks standing to pursue the assessment appeal because the city was an intended third-party beneficiary of the unconsummated purchase agreement whereby Johnson Development agreed to dismiss the special-assessment appeal upon closing of the sale. But this precondition was never met. The record does not support the city's claim that PACT sold the property to Johnson Development. Neither the purchase agreement nor the letter from PACT's attorney evinces a completed sale to Johnson. No evidence indicates that PACT ever transferred legal title of the property to Johnson Development; moreover, it was PACT, not Johnson Development, that subsequently transferred the property to Stuart.[1]

Because the sale never closed, the city's argument that PACT and Johnson Development intended the city to be a third-party beneficiary is irrelevant. Eagle Creek is not bound by their agreement

and has standing to pursue the assessment appeal.

### 2. Eagle Creek's Appraisal

The district court has broad discretion in ruling whether or not to admit an appraisal and a reviewing court will not overturn that ruling unless it is based on an erroneous interpretation of the law or it constitutes an abuse of discretion. See *Buzick v. City of Blaine*, 505 N.W.2d 51, 53 (Minn.1993). The city argues that the district court committed an error of law by admitting evidence of Strachota's appraisal and by relying upon it.

Minn.Stat. § 429.051 (1998) provides:

> The cost of any [public] improvement * * * may be assessed upon property benefited by the improvement, based upon the benefits received * * *.

The benefit received from an improvement is the increase in market value of the benefited land. *Buzick*, 505 N.W.2d at 53. An increase in market value is the difference between what a willing buyer would pay a willing seller for the property before the improvement and after the improvement. *EHW Properties v. City of Eagan*, 503 N.W.2d 135, 139 (Minn.App.1993). Market value is calculated

> based on the highest and best use of the land. Present use of the land is not the controlling factor in determining whether the land has received benefit from the improvement. Rather, the test is whether the land could be used for purposes which would benefit from the improvement.

*Buzick v. City of Blaine*, 491 N.W.2d 923, 925 (Minn.App.1992) (quotations and citations omitted), *aff'd*, 505 N.W.2d 51 (Minn. 1993).

---

1. The city also relies on a warranty deed purporting to convey the property from Johnson to Stuart. But Johnson could not convey any interest in the property because it had no interest in the property. *See Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 550, 21 L.Ed. 322 (1872) (discussing common-law principle that one cannot give that which one does not have, i.e., no one can give a better title to a thing than one possesses).

■ Characteristically, an appraiser in a special-assessment case is to give two values to the property: the first is the value of the property before the public improvement is in place and the second is the value of the property after the improvement is in place. Strachota was to determine the benefit to the property as of August 1998. He did this by assuming that a townhouse complex was to be built on the land, even though as of August 1998 the construction of the complex had just started. (As far as we can determine from the record, the project has just been, or will be, completed this year.) He then assumed that the price a willing buyer would pay for the property *in August 1998* would be determined by the condition of the property as of the completion of the complex *in 2000*. Based on these assumptions, he appraised the before value by looking at a townhouse complex without the public improvements, which would be a project with 166 units. Similarly, he determined the after value by looking at a complex with the public improvements, which would be a project with only 152 units.

The essence of Strachota's appraisal, and the respondent's position, is that due to the particular land configuration and the streets and sewers existing before the public improvements, the improvements were not necessary and in fact resulted in a decrease in the value, because the landowner could only put 152 units in the complex, rather than 166.

As noted above, the city's position is that Strachota's method is not a legally accepted method for appraisals, and thus it was erroneous for the trial court to have admitted his appraisal and to have relied upon it. The city argues that the court erred because Strachota did not value the land either in the before or after condition and that he did not use either the market-data approach or the development-cost approach. The city points to Strachota's testimony that the "appraisal methodology that he used determined the difference in

the land *and profit* before and after the [public improvement] project." (Emphasis in original.) The city goes on to argue:

> The fact that a developer might make less profit because of the assessments [sic] does not mean that the property was not benefited by the amount of the assessments.

■ In short, the city argues that Strachota's approach is improper because it appraises a "rental townhouse project," not the bare land. At the onset, it should be noted that in the appropriate case, the appraisal should take into account any buildings on the property and not merely look at the value of the bare land. *See, e.g., Schumacher v. City of Excelsior*, 427 N.W.2d 235, 239 (Minn.1988) (holding that special assessment must be based on increased market value of existing apartment complex).

■ However, the main thrust of the city's argument is that Strachota "used an improper methodology that has not been recognized by any appellate court" because his method is not one of the four traditionally used by courts: (1) the market-data approach based on comparable sales; (2) the income-capitalization approach; (3) the reproduction-cost, less depreciation, approach; and (4) the development-cost approach. *See Ramsey County v. Miller*, 316 N.W.2d 917, 919–21 (Minn.1982). But the city provides no support for its view that these four methods are exclusive.

■ Moreover, we have previously held that

> any method resulting in a fair approximation of the increase in market value for [a] benefited parcel may be used. A method which on its face appears to be a fair approximation will be presumed valid, with the burden resting upon the objector to show its invalidity.

*DeSutter v. Township of Helena*, 489 N.W.2d 236, 237–38 (Minn.App.1992) (citing *Continental Sales & Equip. v. Town of Stuntz*, 257 N.W.2d 546, 550 (Minn.1977)), *review denied* (Minn. Sept. 30, 1992); *see*

**252**

*also Ramsey County,* 316 N.W.2d at 919 (to determine fair market value of property, all relevant evidence should be admissible considering current practices in real estate area); Minn. R. Evid. 102, 402, 403 & comments (the modern trend favors admissibility of all relevant evidence).

At trial, Strachota testified that the Appraisal Institute, an organization of real estate appraisers, approved the approach he utilized. The city did not challenge this claim on cross-examination and does not challenge it on appeal.

Finally, with respect to the facts of the instant case, as of August 1998, the date that Strachota used in his appraisal, the following events had occurred. (1) In 1994, the city zoned the property R–3— multi–family residential. (In point of fact, the city concedes that the highest and best use of the property was multi-family housing.) (2) In 1997, the city issued a CUP to James Development for multi-family housing. (3) In April 1998, the city issued a second CUP for multi-family housing, this one to Johnson Development/PACT. (4) At or about the effective date of Strachota's appraisal, construction of a multi-family complex had started. In light of these facts, in August 1998 it was almost certain, if not a certainty, that the property would be the site of a multi-family townhouse project within two years. It was therefore reasonable for Strachota to assume that anyone seeking to purchase the property in August 1998 would view the value of the property with a completed townhouse project in place. It is our conclusion that it was likewise appropriate for Strachota to appraise the property by viewing it in the same way.

## DECISION

We conclude that the methodology used by Strachota in his appraisal yields fair approximations of both the before and after values of the property, *see Alstores Realty, Inc. v. State,* 286 Minn. 343, 352, 176 N.W.2d 112, 118 (1970) (value of real estate was for trier of fact to determine)

and that it was not error for the district court to admit Strachota's appraisal and to rely upon it.

**Affirmed.**